AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Western District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Information associated with | ) | Case No.    14-124 |
| the Facebook user ID 100007815096875, | ) | |
| JoshuaRay Vanhaften | ) | |
| | ) | **SEALED** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Northern District of California, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code Section 2339B | Providing material support or resources to Designated Foreign Terrorist Organizations. |

The application is based on these facts:  See attached Affidavit.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth in the attached affidavit.

_____
*Applicant's signature*

ERIL J ROTHL, FBI SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

_____
*Judge's signature*

Date:  10-21-14

Madison, Wisconsin

Magistrate Judge Stephen L. Crocker or
Magistrate Judge Peter A. Oppeneer

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100007815096875, "JOSHUARAY VANHAFTEN" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK 100007815096875 | Case No. 14 - 124 **SEALED** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Eric Roehl, Special Agent ("SA") with the Federal Bureau of Investigation, Madison Resident Agency, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant makes this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      Your affiant has been a Special Agent with the Federal Bureau of Investigation ("FBI") since March 2011.  I am currently assigned to the Madison Resident Agency ("RA") of the Milwaukee Division. Within the Madison RA, I am

assigned to the Joint Terrorism Task Force.  Prior to my assignment with the Joint Terrorism Task Force, I was assigned to the FBI's Counterterrorism Division from September 14, 2008, to March 25, 2011.  During this time, I was a FBI intelligence analyst responsible for assisting field offices with investigations of unknown and suspected terrorist subjects.  Throughout my career with the FBI, I have assisted in multiple criminal investigations and participated in numerous search warrants related to such investigations. As a Special Agent with the FBI, it is part of my duties to investigate violations of federal criminal law, including violations of Title 18, United States Code, Section 2339B, which criminalizes among other things, providing material support to a Designated Foreign Terrorist Organization.  Moreover, as an FBI Special Agent, your affiant is also authorized to investigate violations of the laws of the United States generally and to execute search and seizure warrants issued under the authority of the United States.

3.      It is my experience that individuals providing material support or resources to terrorist organizations will maintain records online and utilize numerous Internet programs.  It is also my experience that these same individuals use the Internet and all Internet instrumentalities, such as business websites, e-mail, social media, and other Internet-based programs to conduct, promote and facilitate their illegal activities. Common places for such instrumentalities of the crime to be stored include electronic mail ("e-mail") properties such as e-mail folders, photos, briefcases, and address books.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not necessarily set forth all of my knowledge about this matter.

5.      Based on your affiant's training and experience and the facts set forth in this affidavit, there is probable cause to believe that Facebook User "JoshuaRay Vanhaften" has used the social media site Facebook within the date range of April 1, 2014 and October 20, 2014 in furtherance of violations of Title 18, United States Code, Section 2339B which criminalizes, among other things, providing material support to a Designated Foreign Terrorist Organization, namely, the Islamic State of Iraq and the Levant.    There is also probable cause to search Facebook, more particularly described in Attachment A to this affidavit, for evidence of these crimes and contraband or fruit of these crimes as described in Attachment B.

## PROBABLE CAUSE

6.      Agents attempted to contact Joshua Van Haften in August 2014 in part because of information provided to the FBI Madison Resident Agency during an interview on July 16, 2014 of Person 1, a former associate of Van Haften.  Person 1 told Agents that Van Haften previously traveled to Egypt and came to the attention of the Eqyptian police after a woman selling things in a marketplace did not like his verbal interaction with her, and made a complaint to the police about Van Haften taking pictures of a military facility, which is forbidden in Egypt.  Person 1 said that because of Van Haften's contact with the Egyptian police, the US Embassy was notified about Van Haften.  Upon notification to the US Embassy Van Haften's sex offender status was

3

discovered and he was returned to the United States. A review of Van Haften's criminal history by your Affiant determined that Van Haften was convicted of Second Degree Sexual Assault of a Child in 1999 as well as Aggravated Battery/Intent Great Harm in 1998. Van Haften was also charged with intentionally pointing a firearm at a person in 1999. Van Haften told Person 1 that he wanted to travel to Syria and Libya and join Jabhat Al-Nusrah.[1] On August 29, 2014, an FBI Agent interviewed Person 2 to follow-up on a complaint provided to the FBI by Person 2. Person 2 stated that on August 24, 2014, she was near the Capitol building in Madison, Wisconsin when she saw her 11-year old son talking to an unidentified man. Person 2 informed the FBI Agent that later the same evening, Person 2's son told her that the unidentified man talked about World War III, Syria, and leaving the United States to go to Syria. On September 22, 2014, the FBI Agent showed a photograph of Joshua Van Haften to Person 2 and her son and both identified the man that they saw near the Capitol building as the man in the photograph shown to them. On September 3, 2014, FBI Agents attempted to locate Van Haften at his last known address. Agents spoke with Person 3, Van Haften's former roommate at that address. Person 3 said Van Haften

---

[1] On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

On December 11, 2012, the Secretary of State amended the designation of AQI to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.

On May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between ANF and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusra, also known as The Victory Front, also known as Al-Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in Lebanon, also known as Support Front for the People of the Levant, and also known as Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

4

had been staying at their apartment sporadically for a few weeks to a month, and that Van Haften did not really have a place to stay and Van Haften paid Person 3 $200 cash to allow him to stay at the apartment. Person 3 stated that approximately a week prior to the interview, Van Haften left for overseas and possibly Turkey. Person 3 said that Van Haften said that he did not like living in the United States and wanted to go overseas.

7.    Person 3 said that Van Haften talked about getting his passport and birth certificate and leaving and that Van Haften made comments referring to jihad. When asked to clarify his statement, Person 3 said that Van Haften folded a $100 bill in a certain way to make the folded bill look like the New York World Trade Center Twin Towers, and folded a $100 bill to make it look like a missile. Person 3 said that Van Haften left nothing at the apartment when he left.

8.    On September 3, 2014, a Homeland Security Investigations (HSI) Agent confirmed that Van Haften left the United States on Tuesday, August 26, 2014 aboard Turkish Airlines Flight 0006 from Chicago O'Hare International Airport for Ataturk International Airport in Istanbul, Turkey. On September 8, 2014, the FBI confirmed that Van Haften had a return flight scheduled from Istanbul to Chicago on November 24, 2014 on Turkish Airlines Flight 0005. An HSI Agent reported that Van Haften was in Egypt from October 2012 to January 2014.

9.    On September 22, 2014 Agents interviewed Person 4 at the FBI Madison Resident Agency. Person 4 stated he met Van Haften through a friend and allowed Van Haften to stay in his house from approximately March or April 2014 to the time Van

5

Haften departed for Turkey in August or September 2014. Van Haften lived at Person 4's residence in Cross Plains, Wisconsin with Person 4, and Person 4's brother, and Person 5.

10.    Person 4 said that Van Haften said something, possibly via text message, about going to Iraq or Afghanistan as he could only stay in Turkey for approximately 90 days.

11.    Person 4 said that Van Haften said that if everything works out, he will not return to the United States. Van Haften did not elaborate on what he meant by everything working out.

12.    With Person 4's consent, your affiant reviewed the Facebook page for Van Haften on Person 4's phone and noted the following posts with the following time stamp: Yesterday (09-21-2014), 3:58pm: Van Haften: "It's calling, I can smell it's perfume! Allah!!!" There was a link for a video: HD Tour of Jannah Paradise – Anwar Al Awlaki The Hereafter Series. [2] Van Haften also posted a link regarding an opinion that the group ISIS was created by the US Government. Your affiant reviewed a segment of the referenced "Tour of Jannah Paradise" video in which an English speaking male described what paradise looked like for worthy Muslims who went there in the afterlife.

13.    Following the interview with Person 4, your affiant verified that Van Haften's personal Facebook page was entitled "JoshuaRay Vanhaften," and learned that

---

[2] On or about July 12, 2010, pursuant to an Executive Order, Anwar Al-Awlaki (also spelled "Al-Aulaqi") was designated by the United States a "Specially Designated Global Terrorist" because of his position as a leader of Al-Queda in the Arabian Peninsula ("AQAP"), a Yemen-based terrorist group that has claimed responsibility for several terrorist acts against the United States. On or about September 20, 2011,  Awlaki was killed in Yemen.

the corresponding Facebook ID for that page is "100007815096875". Your affiant was able to review the public profile associated to the Facebook page and noted that the location for Van Haften was listed as: "Kucuk Istanbul Sanliurfa Turkey."

14.     On September 22, 2014, Agents interviewed Person 5 at the FBI Madison Resident Agency. Person 5 stated that he lived with Person 4 and Van Haften from the spring of 2014 until Van Haften's departure for Turkey.

15.     Person 5 described Van Haften as a non-violent individual, but there was something strange about him. Person 5 stated that Van Haften posted a two or three minute video of himself on Facebook in which Van Haften was walking on a road and Van Haften stated that it was probably the last time that he would be heard from for a while.

16.     Person 5 allowed Agents to view several text messages from Van Haften on Person 5's phone. The messages were dated September 15, 2014. The following is an excerpt sent at 9:50PM: "it's all good Craig, I Ain got no problems yet, and I knew nobody but just as I assumed, I figured I would meet people b/c of my sheer knowledge about things & it'd be all good, brothers would help me, give me money, facilitate in getting me to Iraq to help take over Baghdad." In addition, in a text sent at at 10:28PM from Van Haften in response to a text by Person 5 Van Haften indicated that he had arrived in Syria.

17.     In late September and early October 2014, your affiant reviewed Van Haften's publicly available Facebook page. Van Haften is Facebook friends with Adouw At-Taghout, whose profile indicates he lives in Raqqah, Syria which based on

7

training and experience, your affiant knows is a Syrian stronghold for ISIL. On or about October 5, 2014, Adouw At-Taghout posted the following: "The next brother that likes a pic of Asian women's aurah and it shows on my news I'm blocking ok." Van Haften responded to the post with the following "Yeah, since I've befriended you and a few other militant style brothers, as I'm seeking: many other Muslims started to befriend me, that are associated from your mutual friends. But their agenda is definitely not what I'm seeking, so I unfollow them." At-Taghout also posted the following: "What scares the living daylights out of the enemies is Martyrdom operations These attacks have been proven to be very effective against the Enemies, in particular the American cowards!" Van Haften "liked" the post made by At-Taghout.

18.    Your affiant reviewed Van Haften's Facebook page on October 1, 2014 and noted that Van Haften "liked" the group Ansar Bayt al-Maqdis (ABM).[3] On October 1, 2014, At-Taghout wrote "To you they may be Isis or isil but to us it's the #Islamic State. The blessed land to where the best of Allah's slaves will be gathered. On or about September 30, 2014, Adouw At-Taghout posted the following: "What's wrong with being radicalized? Being radicalized is by far better than being brain dead!!" Van Haften "liked" this post as well. On September 30, 2014, At-Taghout posted a photo of the ISIL beheading of James Foley. Van Haften wrote the following comments as a response to the post: "Yet, their cursed secular laws are worse than the laws of Islam,

---

[3] According to the Department of State's website, on April 9, 2014, the Department of State announced the designation of ABM as a Foreign Terrorist Organization (FTO). Created in 2011 following the Egyptian uprisings, ABM is responsible for attacks on Israel and security services and tourists in Egypt. ABM – who shares some aspects of AQ ideology, but is not a formal AQ affiliate and generally maintains a local focus – was responsible for a July 2012 attack against a Sinai pipeline exporting gas to Israel. ABM has also targeted government officials, including the September 2013 attempted assassination of the Egyptian Interior Minister, and the January 2014 assassination of the head of the Interior Minister's technical office. In February 2014, ABM expanded its targets to include foreign tourists, and claimed responsibility for the bombing of a tour bus in the Sinai Peninsula, killing the Egyptian driver and the three South Korean tourists.

and they want to say Shari'ah is worse than their secular laws.  A bunch of morons sucking on melons." "If the goddam Americans and sons of satan, Israeil wanna mutilate the dead, shit, we get an eye for an eye fool.  Grow a set of nuts!  Climb that fuckin tree and getcha some."  Van Haften "liked" the following post made by At-Taghout on September 30, 2014:  "The happiest sight for us, is to meet the enemy on the battlefield!!"  On or about September 28, 2014, Adouw At-Taghout wrote "Allah sent dark clouds over #Raqqah to submerge #US and its Allies in fear.  They can't bomb what they can't see.  #Khilafah #islamicState."

19.      On October 3, 2014, your affiant interviewed Person 6, a former roommate of Van Haften.  Person 6 also employed Van Haften during the summer of 2014 as a painter for his company.  During the course of the interview, Person 6 allowed Agents to view a series of Facebook messages exchanged between himself and Van Haften on October 1, 2014.  Below is a verbatim excerpt:

Person 6:  whats happening there going to come home some day?

Van Haften:   Well, Turkey is looking like it is divided at the moment about attacking ISIS, which if they do then I'm gonna attack them.

Person 6:  be carefull its not your fight stay safe

Van Haften:  It's gonna be coming soon.  I was about to cross to Syria the day before the Americans through Saudi and UAE, started bombing in Syria from their ships.

Person 6:  Well be carefull

9

Van Haften:  I was gonna be in the very city they bombed.  But I didn't make it.  Hopefully soon though.  I'm not too worried, maybe at the moment it happens, but I'm kinda jumping headfirst into it.  I'm tired of this life man.

Person 6:  I know life sucks I'm really struggling with every thing

Van Haften:  I gotta do some courageous tho.  I know, America things really suck, don't get any bad ideas like suicide tho!!!

20.     On October 7, 2014, your affiant reviewed Van Haften's Facebook page which included a post made by Van Haften on October 7, 2014 that included the phrase "Ya Baghdadi!" and a video.  Your affiant reviewed the video, which appeared to be a 1 minute and 50 second propaganda video for ISIL.  The ISIL flag was shown several times and the video included individuals that appeared to be Islamic extremists engaging in battle.  Based on my training and experience, your affiant knows that Abu Bakr al-Baghdadi is the leader of ISIL.  Your affiant's review of the profile on October 7, 2014 also revealed that Van Haften "liked" the Facebook page "Support Khalifaa bagdadi."  I know from my training and experience that Khalifaa Bagdadi is a reference to Abu Bakr al-Baghdadi and Khalifaa is another term for Caliph.  A caliph is the leader of the Islamic Diaspora.

## DESIGNATED FOREIGN TERRORIST ORGANIZATION

21.     On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history. In audio recording publicly released on June 29, 2014, ISIS announced a formal change of ISIS's name to Islamic State ("IS")

22.     Based on my training and experience, and based on consultation with other experienced counterterrorism investigators, your affiant believes Van Haften practiced tradecraft commonly used by terrorists by booking a ticket to Turkey, which shares a land border with Syria and has been used frequently by extremists as an entry point to wage violent jihad by joining ISIL. Van Haften has a violent criminal history to include the sexual assault of a child as well as an offense in which Van Haften pointed a firearm at a person. Van Haften stated his support for ISIL and intent to attack Turkey if they joined the fight against ISIL. Additionally, Van Haften texted Person 5 that he was in Syria and planning to go into Iraq to fight Shiites. Furthermore, Van Haften posted statements on his Facebook account referencing paradise being near and a video featuring Anwar Al Awlaki, the deceased cleric responsible for radicalizing countless

11

extremists. Based on these posts, it is clear that Van Haften uses Facebook as a means to communicate with others in the United States and abroad regarding his radical views and interest in joining a designated foreign terrorist organization, to include ISIL, in order to commit violent jihad. Based on these assertions, it is reasonable to believe that Van Haften traveled or intends to travel into Iraq or Syria to join ISIL and to engage in violent jihad, and thereby provide material support of terrorists in violation of 18 United States Code, Section 2339B and that evidence related to these crimes exists at Facebook.

## FACEBOOK

23.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.Facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

24.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

12

25.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

26.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

27.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the

13

event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

28.   Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos associated with a user's account will include all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

29.   Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a

14

Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

30.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

31.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

32.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

33.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

34.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

35.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can

also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

36.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

37.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

39.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For

16

example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

40.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

42.   Your affiant submitted a Preservation Letter to Facebook for account "JoshuaRay Vanhaften" on September 22, 2014 in order to ensure that Facebook maintains all referenced records.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

44.     Based on the forgoing, I request that the Court issue the proposed search warrant.

45.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

47.     I request that the Court order Facebook not to notify any person (including the subscribers or customers of the account(s) listed in Attachment A) of the existence of the requested warrant until further order of the Court.  Facebook is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2).  Pursuant to 18 U.S.C. § 2703, I seek a warrant requiring Facebook to disclose records and information in connection with a criminal investigation.  This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant … is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant … ." Id.

48.     Here, such an order is appropriate because the requested warrant relates to an ongoing criminal investigation that is neither public nor known to all of the

targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested warrant will seriously jeopardize the investigation, by endangering the life of physical safety of any person, giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses or otherwise seriously jeopardize an investigation. See 18 U.S.C. § 2705(b).

49.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

SPECIAL AGENT ERIC ROEHL
Federal Bureau of Investigation
Madison RA/JTTF

Sworn to before me this _205T_ day of October 2014.

United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100007815096875, "JoshuaRay Vanhaften," which is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the

groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)   All IP logs, including all records of the IP addresses that logged into the account;

(h)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)   All information about the Facebook pages that the account is or was a "fan" of;

(j)   All past and present lists of friends created by the account;

(k)   All records of Facebook searches performed by the account;

(l)   All information about the user's access and use of Facebook Marketplace;

(m)  The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2339B, which criminalizes among other things, providing material support to a Designated Foreign Terrorist Organization involving "JoshuaRay Vanhaften" between the dates of April 1, 2014 and October 20, 2014 including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications regarding or information about Syria, Iraq, Afghanistan, Islamic State of Iraq and the Levant (ISIL), Islamic State of Iraq and al-Sham (ISIS), the Islamic State of Iraq and Syria (ISIS), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production, Jihad, martyrdom, hijrah, the travel plans of communicants on Facebook or their associates, the use or acquisition of weapons or explosives, the physical location of communicant or their associates, the remittance or transfer of money,

3

operational security, other means of communication used by the communicants or their associates.

(b) Material support or resources to terrorists.

(c) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.