**Michael J. Spierer, Ph.D., LLC**
**3001 Pelham Road**
**Madison, Wisconsin 53713**

**(608) 347-9401**
**(608) 271-4223**

February 12, 2017

Joseph Bugni
Federal Defender Services of Wisconsin, Inc.
22 East Mifflin Street
Suite 1000
Madison, Wisconsin 53703

      Re: Joshua Van Haften

Dear Attorney Bugni:

At your request and with his cooperation, I conducted a psychological evaluation of Joshua Van Haften (dob: 01/15/1981). Mr. Van Haften has entered a guilty plea to one count of providing material support to terrorists. The examination was undertaken to offer insight into his psychological background for the purpose of assisting the Court in understanding factors that may have led him to act as he did, anticipating that this information may be of use at sentencing. The examination consisted of a review of the materials you provided, two interviews with Mr. Van Haften and the administration of two psychological tests. What follows is a report of the information I gathered and the conclusions I reached. All opinions, unless otherwise noted, are held to a reasonable degree of professional probability.

REVIEW OF RECORDS

INDICTMENT

Joshua Van Haften is charged with one count of knowingly attempting to provide material support and resources, namely, personnel (including himself), to a foreign terrorist organization, namely, the Islamic State of Iraq and the Levant (ISIL), knowing that this group was designated as a terrorist organization and that it had engaged in and was engaging in terrorist activity and terrorism.

MEMORANDUM ON TERRORISM ENHANCEMENT - JOSEPH A. BUGNI & SHELLEY M. FITE - JANUARY 20, 2017

Mr. Van Haften's attorneys submitted this document to the Court arguing against invoking a terrorism enhancement at the time of sentencing, requesting that the Court consider the following.

The Court is asked to reach a determination about whether Mr. Van Haften's crime was "calculated to influence the government by intimidation or coercion." The Memorandum asserts that that Mr. Van Haften's actions were not and that evidence weighs strongly against such an inference. It argues that Mr. Van Haften manifests mental health problems and believes in such things as numerology, astrology and Islamic prophecy, which led him to believe that the world would end soon. He believes that what is known as the New World Order will be established and will result in the persecution of Muslims throughout the world. He believes that military rule will come and that Muslims will be rounded up, placed in FEMA camps and exterminated on a mass scale.

The Memorandum argues that Mr. Van Haften's decision to pursue life in Syria was not the result of a political agenda, but rather a desire to become part of a coming caliphate. Wanting to be part of this and to be protected from what he believed to be impending doom facing the United States, Mr. Van Haften repeatedly pledged his allegiance to ISIS, even though he harbored deep suspicion that news accounts about what ISIS was doing were inaccurate. He believed that much of what was reported about ISIS was propaganda promulgated by Israel and Freemasons to inflame further persecution of Muslims and he believed that ISIS was a CIA front.

To understand Mr. Van Haften's thinking and to understand his motivation, the Memorandum indicated, it is important to understand his background and history.

In April 2012, John Vaudreuil, the United States Attorney for the Western District of Wisconsin attended a talk given at the Islamic Center of Madison. When the presentation ended, an attendee stopped to talk with him about "conspiracy theories." Years later, Mr. Vaudreuil would describe the conversation with the man, identified as Joshua Van Haften, as "kind of odd." After talking with Mr. Vaudreuil, Mr. Van Haften handed him an envelope that included his return address. The envelope contained an eight-page paper Mr. Van Haften had written in which he discussed numerology, astrology, Islam and other lessons he reported having learned watching from YouTube. Key points Mr. Van Haften identified included the following:

- Names have correlating numbers and meanings and provide insight into a person's character and life path.

- Using Martin Luther King's name, if you add up the numbers, it provides a whole name 11 and four 9's.

- Dr. King's numbers are related to "caring deeply about humankind and love" and "being a visionary" and "promoting better standards of living for the less fortunate in the community."

- The numbers 9 and 11 show up in Mr. Van Haften's name. Much of his life, like Dr. King's, can be explained through those numbers.

- Numerology helps Mr. Van Haften's life make sense and after learning that the numbers 9 and 11 were important, he began seeing them everywhere including clocks, his address and a scar on his face.

Mr. Van Haften cited a series of YouTube videos he watched in 2009, entitled, 'The Arrivals,' a compilation that purports to explain various mysteries, including, the Pyramids, Solomon's Temple, the illuminati and the current Prince William. The series opened his mind, he said, to a hidden world. The letter he gave Mr. Vaudreuil explained that during the months after he watched The Arrivals, he traveled the United States and was exposed to a variety of thinking. While visiting Texas, for example, he found a book about the Freemasons that he thought explained "the world of 'science' we all now live & interact with." In Florida visiting his grandmother, he found a book on numerology, which Mr. Van Haften wrote, "told me just from my name things about me that were just amazing."

Mr. Van Haften explained that numerology caused everything in his life making sense. In his Facebook posts, which were accompanied by pictures, he reported his belief that the numbers 9 and 11 tie together everything in his life. In it, he said that he was "against G.H.W.B.," (the 43rd President of the United States) and that he is "against the institution of the Zionist state of Israel."

Mr. Van Haften wrote that the meaning of the eight-pointed star on the streets of the U.S. Capital mean that the country is controlled by United Kingdom royalty. This, he wrote, is repeated in the design of the Statue of Liberty's base, which Mr. Van Haften showed in photos on Facebook. He also wrote that the eight-pointed star appears locally at both East Towne and West Towne Malls in Madison.

Mr. Van Haften wrote that the ruling elite in the United Kingdom have a prominent place and that Prince William will be crowned king in 2013, when he is 33 years old and would become the Antichrist. His writing indicated his belief that Prince William shares a bloodline with George Bush, Barack Obama, Dick Cheney and that they are all "2nd cousins to the bloodline of the royal family." Prince William and Princess Kate had prominent places in his discussion of politics and he described them as part of what he characterized as the black nobility that rules the world.

Another theme about which Mr. Van Haften wrote was that things in the world were going to get very bad, very quickly. He wrote that the London Olympics would be a "big satanic ritual" and that something would happen that would be blamed on Muslims and would result in the persecution of Muslims around the world, including him. The Memorandum indicated that Mr. Van Haften has been open to sharing his world view with anyone willing to listen and even with some who refuse to do so.

Two days after he spoke with Mr. Vaudreuil, for reasons that were unclear, Mr. Van Haften met with FBI agents in their Middleton office. Based on their interview, the agents prepared a one-page report that identified the issues Mr. Van Haften identified as part of his belief system, which were similar to those he outlined in the letter he gave to Mr. Vaudreuil. In addition, he wrote that he hoped to travel to the Middle East, to learn Arabic and to go on a Hajj, although he had no travel plans at the time. *Mr. Van Haften noted that his status as a registered sex offender had created problems for him in the United States and had prevented him from getting a good job or getting married* (emphasis added). Therefore, he wrote, he believed that he would need to move to another country.

One month after he met with the FBI, in May 2012, Mr. Van Haften came to the attention of law enforcement again. As he was preparing to travel to Egypt, he was willing to talk to anyone who would listen his thoughts about the world and shared them with customs agents at the airport, after which, the FBI interviewed him again and made many of the same observations they had earlier. After that meeting, Mr. Van Haften left for Egypt, where he spent several months.

Other factors:

In addition to the bizarre ideas he shared with the FBI, Mr. Van Haften also talked about his thoughts with friends in Madison and expressed them on Facebook. Craig Wellman, with whom Mr. Van Haften was living before he left for Turkey, said of him, "(He) never talked about going to Paradise, conducting an attack or engaging in violence," *and added that Mr. Van Haften was "a nonviolent individual, but there was something off about him* (emphasis added)."

Mr. Van Haften sustained a head injury in an automobile accident as a teenager. Not only did he suffer fractures and a brain injury, but the incident has become a significant part of his worldview. Just as Mr. Van Haften obsessed over conspiracy theories, *"he also has obsessed about that accident* (emphasis added)."

When he was 18 years old, Joshua Van Haften was charged with Second Degree Sexual Assault of a Child. Following conviction, his name was placed on the Sex Offender Registry for life. On the night of the incident leading to his arrest, he had gone to a high school party with friends, including a 15-year-old sophomore girl. That night he and the 15-year-old had sex twice, once at the home of the host and again in his friend's car. When he brought the 15-year-old home after

curfew, she told her parents that Mr. Van Haften had raped her and they called the police. When he spoke to officers, Mr. Van Haften acknowledged having had sex with a girl, but said that it was consensual. Nevertheless, his admission led him to be charged and after entering a plea, to be placed on probation. In addition to the humiliation that accompanies listing on the Sex Offender Registry, Mr. Van Haften has felt a sense of shame. While on probation, he was required to abide by regulations and restrictions that prevented him from spending time with high school friends, his sister and prohibited him from attending parties. At the time, he experienced psychological problems, rebelled, violated probation and was incarcerated for three years.

While in prison, Mr. Van Haften became a Muslim and following his release, appeared to settle down. He struggled to follow some of the rules of his faith and self-medicated with marijuana. However, except for a conviction for Disorderly Conduct in 2007 and a retail theft in 2008, he has not been in trouble with the law.

While he was in prison, Mr. Van Haften appeared to mature. After a short courtship, he married a woman, but they remained together only briefly. When his wife learned of his past and his registry requirement, she left him and the two divorced after just three months of marriage. His presence on the registry also affected his ability to live in Egypt. When he went there, he reported that his life was good. He had friends, was accepted and had begun a new wife with the baby on the way. However, when after telling a stranger in a market about numerology and about his doomsday beliefs, Egyptian police became involved and when they learned he was a registered sex offender, Mr. Van Haften was deported.

After he returned to the United States, Mr. Van Haften came to believe that Muslims soon would be exterminated. This belief and his presence on the sex offender registry led him to feel that there was little productive he could do in life and his anger and resentment began to grow. In addition, he believed that doomsday was coming, even after the predictions he had made in the letter he gave to Mr. Vaudreuil proved false. Nevertheless, Mr. Van Haften continued to predict that the New World Order would be established and that people like him would be rounded up, put into FEMA camps and later killed. His larger conspiracy theory involved Chase Bank, which he thought was a Nazi front,) the Bilderbugs, the Bushes and the Obamas, who he identified as second cousins, all of whom, he believed, were conspiring to take over the world and to declare war on Islam.

Facebook Statements by Joshua Van Haften

In addition to using Facebook to warn readers about Prince William and impending doom, Mr. Van Haften espoused extreme Islamist positions. He vented, in vitriolic and vulgar language, about the world's problems. He expressed hatred of Israel and the United States and pledged support for Abu Bakr al-Baghdadi, the leader of ISIS. His worldview broadened to include not only numerology and bizarre thinking about well-known personalities, but he came to write about Muslim-centric prophecy.

It is noteworthy that most of the incendiary speech cited in the Presentence Report (PSR) came not from Mr. Van Haften, but from "Likes" he added to the comments of others on Facebook, supporting the opinions of others. Most of the statements about martyrdom outlined in the PSR were not Mr. Van Haften's words, but related to the statements of other that he "Liked" on Facebook. He did author a number of extreme statements in which he spoke of his disdain for those who violated the laws of Islam and posted pictures of half-naked women. He noted his disdain for Turkish people who he felt were constantly trying to swindle him wherever he went, for people who smoked and noted that he could not wait to "get to Dawlah where brothers are cleansed of (sic) this smoking shit."

Some of Mr. Van Haften's comments on Facebook were intense. He was relentless in expressing his thoughts of what was happening in the Middle East. He wrote as he made his way to Syria, "I'm on my way to Shaam to fight the dumb Americans." "American," he wrote, "is a damn trap. It's horrible! I hate it, hate it, hate it there. So you can have fun, do your da'wah, but I'm gonna kill me some American soldier boys." "Fuck their godless laws! I hate it! *Fuck being a 'sex offender' for life there* (emphasis added). They didn't respect me my whole life. A bunch of shaytan's. Death to them and all their little children."

In a conversation with his mother he excoriated President Obama and a group he called "Kuffar disbelievers," including George Bush, Bill Clinton and "that Zionist slave dog Biden to hell." *He then softened, writing "thank you for bearing with me while I vent my anger verbally. Let go of my past? They will never let go of my past. It's for life. All my life I would have to tell everyone about my 18-year-old mistake of being with the 15-year-old that I was in high school with* (emphasis added)."

The final theme in Mr. Van Haften's posts on social media were pledges he made to al-Baghdadi, the leader of ISIS. In addition, he reposted ISIS propaganda videos and statements that were disturbing. *He expressed anger at the Western world, wrote about wanting to find a new life in Syria and expressed willingness to pledge allegiance to ISIS so that he could achieve that new life.*

Mr. Van Haften's attraction to ISIS came to prominence during the week that preceded his arrest, when he sent an e-mail to someone, apparently an American and possibly an informant or CIA cover, about going to Syria with him. He wrote:

"Sell all of your things that cost money akhy (sic), because once you come here, there is no going back & if the Americans ever catch you then it's the end anyhow. This is gonna be the final battle, as America is gonna fall into chaos & the elite, super rich are gonna rule America with all their stupid money. Forget about America. ..."

"America is gonna be just like the movies of the end times. Aliens are jinn & they are gonna have zombies too, the walking dead people, that have lost their brains from too much drugs and alcohol."

"The gates are gonna close soon, the airports will shut down & money be gone & everybody will be chipped with RFID (GPS) tracking chips that continues to be part of their godless community."

Twenty minutes later, Mr. Van Haften sent a follow-up message to the man, which read, in part:

"... put everything you can for sale, craigslist or whatever. We just entered another 'Blood Moon' phase. Shit is gonna pop off very soon. The Obama administration & shayateen are going to make it happen very soon. Catastrophe after catastrophe. Blame the Dawlah & break the Americans economy, so they can have martial law. It's no joke. You want to get out of America ASAP."

"... They like drama. That's all America is, a big dramatization and 20th Century FOX movie bullshit. All paid for by the Zionist Federal Reserve money."

As he prepared to go into Syria, these were the things about which he was thinking.

The Memorandum argued that given Mr. Van Haften's unhinged, irrational worldview, the government could not prove by a preponderance of evidence that his crime was calculated to influence the behavior of the government.

Another question to be addressed is how the Court will decide whether Mr. Van Haften's crime, attempting to join ISIS, was calculated *to influence or affect the conduct of the government by intimidation or coercion*.

The Memorandum noted that Mr. Van Haften's motivation to go to Syria was not "calculated to influence or affect the conduct of the government." Rather it was built around his sincere, but misguided, belief that the world was coming to an end, that the Antichrist soon would be revealed and the New World Order would be established. With that in mind, Mr. Van Haften wanted to leave America to go someplace he felt would be safe. Islamic prophecy, numerology, astronomy and YouTube videos pointed to Syria. If going there also meant joining ISIS, he was willing to do so because, at least, it would get him to Syria. In his mind, ISIS probably was not real, but rather had been invented as part of the Zionist agenda to inflame sentiment against Muslims.

NEUROPSYCHOLOGICAL EVALUATION - WILLIAM A. MERRICK, PH.D. - APRIL 28, 2016

Dr. Merrick met with Joshua Van Haften on March 21, 2016 and April 26, 2016 to conduct a forensic neuropsychological evaluation. He reviewed documents with which he had been provided, the contents of which are summarized, as follows.

Medical Records

- On May 19, 1994, Joshua Van Haften, then 13 years old, was struck by an automobile as he rode his bicycle, sustaining multiple fractures and other injuries. His Glascow Coma Scale (GCS) score was 4-5 and rose to 6. Such scores are thought to reflect the presence of coma. Following a hospitalization of more than one month, he was discharged to an outpatient rehabilitation program that included physical therapy, occupational therapy and speech therapy.

- Mr. Van Haften's initial speech and language therapy evaluation noted difficulties with memory, organizational and abstract language skills. At discharge the status of his abstract reasoning skills was indeterminate because of uncertainty about his pre-accident functioning.

- On June 29, 1994, his mother reported that he had become aggressive with his siblings.

- On July 2, 1997, Mr. Van Haften was struck on the back of the head when he became involved in an altercation. He was diagnosed with blunt head trauma and concussion.

- On March 13, 2007, Mr. Van Haften broke a glass picture over his head and sustained lacerations that were closed with staples. He used duct tape to cover his wound.

Psychiatric Records – Wisconsin Department of Corrections

- Mr. Van Haften successfully completed sex offender treatment (SOT) on April 26, 2002. His discharge summary noted a concern about his preoccupation and dependence on Islam as a pro-social guide to life.

- Between May 15, 2001 and January 4, 2003, while a resident at the Racine Youthful Offender Correctional Facility (RYOC), where he participated in SOT treatment, Mr.

Van Haften also was seen in psychotherapy by Pamela Ross Mahnke, Ph.D. On May 15, 2001, he told her that he had turned to Islam and because of this, always had to tell the truth. An entry dated September 14, 2001, indicated that he had expressed a desire to live in an Islamic country, which, he said, "follows the rules of the Koran." Later that month he reported that his conversion to Islam was "hard for his family and for himself." *He reported feeling depressed, lacking friends and family and having no purpose in life.*

- An entry dated October 8, 2001, described Mr. Van Haften as "having trouble … trying to carry out the broader provisions of his new religion," noting that he had become increasingly isolated, intolerant and arrogant. Entries in early 2002, reflected his struggle to find his place in the world and his attempts to "better" himself by following the percepts of Islam to "purify" his thinking. *Dr. Mahnke described him as very rigid and tough on himself, seeing no shades of gray.* An entry dated March 23, 2002, noted his belief that he "must spend his life alone so that he will not hurt anyone." Dr. Mahnke described his speech as "pressured."

- In May 2002, Mr. Van Haften began psychotherapy with Donald Jaskulske, Psy.D. after Dr. Mahnke left the institution. *On May 13, 2002, he told him that he was joining "gangs in different religions" in order "to fulfill a need to be liked, have friends and belong. He also gained a sense of stability that he did not have at home* (emphasis added)."

Social Security Disability

- Mr. Van Haften applied for Social Security disability benefits, claiming "emotional/mental - learning disability" needs. An evaluation by a psychologist, Cornelia A. Green, Ph.D., dated February 4, 1999, reported a WAIS-III Full Scale IQ of 97, Verbal IQ of 99 and Performance IQ of 106.

- A mental status examination completed by Linda Ingison, Ph.D. on February 10, 2012, indicated that Mr. Van Haften was thought to meet criteria for diagnosis of *Bipolar Disorder, not otherwise specified, with psychotic/paranoid features* (emphasis added). He was believed to have at least moderate difficulty understanding, remembering and carrying out instructions, getting along with others, concentrating, attending to as well as maintaining work pace. Dr. Ingison recommended that if he was awarded benefits, a protective payee be appointed to assist in money-management. Mr. Van Haften was deemed eligible for Social Security benefits on February 16, 2012.

Clinical Interview

Dr. Merrick conducted an interview of Joshua Van Haften during which he gathered the information summarized below.

Social History

Joshua Van Haften was born in Arlington Heights, Illinois and attended elementary school in several communities until his mother and two younger siblings settled in Janesville, Wisconsin. His parents did not marry and his father never has been involved in his life. His mother married his stepfather in 1987, but they divorced three years later after two children were born. Records indicated that the family received in-home social services in Illinois because his stepfather physically abused Mr. Van Haften's mother and all the children. Joshua was described as having reported that he felt that he had no family because he had spent so much time in foster homes and never was placed with his half-

siblings. In part because he felt distant from his family, records indicated that he was drawn to a gang, Imperial Gangsters, IG, in 1998, but was involved with them for only about six months, Mr. Van Haften reported, because "they didn't like me anymore."

Soon after the family arrived in Janesville in 1993, a CHIPS petition was filed on behalf of Joshua and his siblings and his mother voluntarily placed them in foster care for six months. Mr. Van Haften reported that he and his mother argued frequently and that she hit him with her hands and with a belt. He defended himself by kicking at her. He reported that he liked school, made average grades and did not require special educational services, noting that he had been in counseling "working on anger management and issues related to (having been) emotionally and physically abused."

Joshua Van Haften converted to Islam in November 2000, while incarcerated at the Dodge Correctional Institution. Mr. Van Haften has been married twice, each time to a Muslim woman, the first of whom he met on a "Muslim dating site." His first marriage lasted three months, ending in November 2006. A second marriage to a Palestinian woman took place in Egypt in September 2013, after they met at a mosque. The Imam agreed to marry them after they had dated for just two months and the relationship ended when Mr. Van Haften was arrested and deported to the United States in January 2014.

## Educational & Vocational History

Joshua Van Haften reported that he was placed in special educational programming during his junior year of high school because he was "overly emotional, acting out and presenting behavioral problems." However, his report was not verified in school records reviewed by Dr. Merrick. Joshua stopped attending school during his senior year at Parker High School in Janesville after he was arrested and charged with sexual assault. He earned a high school equivalency diploma (HSED) in 2001, during his incarceration at the Racine Youthful Offender Correctional Facility. He earned four credits from Blackhawk Technical College and completed a massage training program at the Lakeview School of Massage Therapy.

Mr. Van Haften reported having worked in the construction industry from 2005-2008, after which, he said, he supported himself as a massage therapist for three years. In 1999, he began receiving Social Security benefits, which were renewed in 2012.

## Mental Health History

Mr. Van Haften was seen at the Janesville Counseling Center from 1992 to 1996, after having gotten into trouble in sixth grade. He reported having seen counselors "episodically" during high school and records Dr. Merrick reviewed indicated that as an adolescent he had been diagnosed with both Conduct Disorder and Oppositional Defiant Disorder.

Although records indicated that Mr. Van Haften had been hospitalized in March 2000, following a suicide attempt in which he cut his wrists, while at the Racine Youthful Offender Correction Facility, Mr. Van Haften insisted that this event had taken place while he was living in a halfway house between October 1999 in January 2000. After the incident, he was placed on Zoloft, which he took until May 2000. A psychological evaluation conducted at the time by Robert Gordon, Ph.D., diagnosed Mr. Van Haften with Adjustment Disorder with depressed mood and Borderline Personality Disorder.

Mr. Van Haften participated in sex offender treatment between November 2000 and April 2002, and was seen in individual counseling from 2001-2003, while at the Racine Youthful

Offender Correctional Facility. He also was in therapy in 2003, during placements at the Gordon Correctional Center and the Stanley Correctional Institution. Following his release from prison in 2005, Mr. Van Haften sought mental health services, he said, "to help me reintegrate." During that time, he was taught relaxation exercises and placed on Zoloft.

Medical History

Mr. Van Haften sustained a significant head injury at age 13, when he was struck by a car while riding his bike. In addition to multiple lacerations of the face, neck and extremities, he also sustained several fractures and a traumatic brain injury. Following the injury, he developed tremors in his right hand and began writing with his left. Nevertheless, he still uses his right hand for many tasks, including eating and using a hammer or screwdriver. Although he denied that his personality changed after the 1994 accident, he indicated that the reactions peers had to him shifted. When he returned to school, Mr. Van Haften said, he was bullied and called cruel names such as "crash dummy," "Scarface," and "cripple." He reported that the name-calling caused him to feel inferior and got him into fights. He said he felt lonely, isolated, had low self-esteem and felt unaccepted by his peers.

AODA History

As a teenager and young adult, Mr. Van Haften smoked cigarettes and marijuana and used alcohol, none of which he characterized as problematic. He reported having "huffed" air freshener 15-30 times as a teenager; and he reported having tried hallucinogenic mushrooms twice in 2011.

Legal History

As a juvenile and adult, Joshua Van Haften compiled an extensive criminal history, summarized by Dr. Merrick in a chart, details of which were appended to his report. It is noteworthy that most of the charges involving theft and assault arose when he was a juvenile and included Retail Theft, Disorderly Conduct, Obstructing and Resisting and violations of probation. The most significant adult charges included Substantial Battery and Second-Degree Sexual Assault of a Child, the latter of which led to Mr. Van Haften being placed on the Wisconsin Sex Offender Registry for life at age 18. Dr. Merrick noted that the first three juvenile offenses committed by Mr. Van Haften occurred after he was placed in foster care for the first time and that he committed only one additional juvenile offense prior to the motor vehicle accident of May 19, 1994, in which he sustained a traumatic brain injury.

Neuropsychological Evaluation Findings

Dr. Merrick administered an extensive neuropsychological test battery consisting of thirteen instruments in addition to a clinical interview. The following is a summary of the findings he reported.

Joshua Van Haften was oriented to time, place, person and purpose. He appeared to have no difficulty understanding the instructions presented or responding to questions posed. Mr. Van Haften appeared at least functionally literate in Arabic as well as English. Thought processes were logical and goal-directed and he seemed to be a relatively reliable historian. He reported no history of hallucinations or delusions and although no evidence of preoccupation was noted in his thinking, he readily provided extended, detailed discussions of anything related to his Muslim faith.

Mr. Van Haften's responses to the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) indicated that he had tried to present himself as unrealistically virtuous and unwilling to disclose certain aspects of his personality. The profile was indicative of the endorsement of an array of psychological problems, none of which was extreme. The profile pattern suggested an individual whose psychological makeup is characterized by extreme and chronic maladjustment. Individuals with this pattern tend to be immature and alienated from or suspicious of others. They are manipulative, self-indulgent, narcissistic, impulsive and aggressive and minimize responsibility for their actions. Such individuals are likely to have troubled interpersonal relationships. Personality disorder diagnoses are common, most often with antisocial and paranoid features.

Summary of Findings

Dr. Merrick diagnosed Mr. Van Haften with Antisocial Personality Disorder; Mild Neurocognitive Disorder, Due to Traumatic Brain Injury; and Rule-out Conversion Disorder (Functional Neurological Symptom Disorder). He indicated that Mr. Van Haften reported experiencing tremors in his right hand that make writing difficult, but noted that a neurological basis for this finding has not been established.

SOCIAL SECURITY ADMINISTRATION

Among the Social Security records were the following.

Consultant Psychological Report – Cornelia A. Green, Ph.D. - February 4, 1999

Mr. Van Haften was seen for evaluation as part of his application for Social Security benefits. At the time, he was residing in a halfway house run by the Rock Valley Correctional Program. At the time, he was on probation for substantial battery, underage drinking and carrying a concealed weapon. He attends Parker High School in the morning, where he receives help from a special education resource teacher and attends four classes. He obtained extremely inconsistent results on the Wechsler Adult Intelligence Scale-III (WAIS-III) on which he obtained a Full-Scale IQ of 97; Verbal IQ of 99; and Performance IQ of 106. Although he was a senior in high school at the time of the evaluation, his scores on the Wechsler Individual Achievement Test (WAIT) placed Mr. Van Haften's overall functioning at a mid-seventh grade level, composite scores showed that both Reading and Mathematics were at mid-sixth grade equivalent, meaning that his achievement showed specific learning disabilities in those areas. Dr. Green diagnosed Impulse Control Disorder, not otherwise specified and Adjustment Disorder with mixed disturbance of emotions and conduct (Axis I); and Learning Disorder, not otherwise specified (Reading/Mathematics) (Axis II).

Consultant Psychological Report – Linda Ingison, Ph.D. - February 10, 2012

Mr. Van Haften met with Dr. Ingison to conduct a mental status examination at the request of the Disability Bureau. Mr. Van Haften reported that he has a high level of energy and difficulty sleeping. He said that when his energy is high he does a lot of things and gets minimal sleep. The kind of "high" he described began when he was 28 or 29 years old. Mr. Van Haften reported "no one likes me." He indicated that because he is a registered sex offender he is unable to have a life or family. *He said that he was so upset when he received this designation that he petitioned for a death sentence for the offense* (emphasis added). He reported having a lot of anger and rage as a result of his sex offender designation. *He described his current mood as "depressed for life* (emphasis added)."

Mr. Van Haften's thinking appeared organized and logical, but he spoke rapidly and his manner was somewhat abrupt. He was oriented to time, place and person and appeared to have adequate memory for recent and remote events. Concentration appeared good. Dr. Ingison diagnosed History of Oppositional Defiant Disorder; Bipolar Disorder, not otherwise specified with psychotic/paranoid features (Axis I) and Learning Disabilities, per records, in reading and math as well as processing speed (Axis II).

Regarding his capacity to work, Mr. Van Haften likely would have moderate to marked limitation understanding, remembering and carrying out instructions; moderate to marked limitations getting along with supervisors and others. He would have mild to moderate limitations with concentration and attention. He would have moderate difficulties with pace, stress and change. He states that when his mood is elevated, if he had money, he would spend it and, on this basis, a payee is recommended.

## DEPARTMENT OF CORRECTIONS - MEDICAL RECORDS

Psychiatric Evaluation - Charles Van Der Heide, M.D. - March 4, 2004

Joshua Van Haften was seen by Dr. Van Der Heide following transfer from a minimum-security facility to a medium security placement after getting into conflicts with guards that had to do with his belief that his rights had been violated as a result of searches of his religious papers. He spoke out against what he considered to be the spitefulness of guards and his dislike of their hostile interchanges. He had been taking Remeron, which he discontinued because it made him feel "too blurry" during the day. On mental status examination, he appeared oriented, alert, rational and coherent. His speech was characterized by some overelaboration, but he denied symptoms of depression or suicidality. He was diagnosed with Mood Disorder, not otherwise specified; TBI, by history (Axis I); as well as narcissistic and possibly paranoid personality characteristics (Axis II). No further follow-up was deemed necessary.

Dr. Van Der Heide noted that on April 26, 2002, Mr. Van Haften had been assessed by Drs. Jaskulske and Mahnke as having successfully completed sex offender treatment (SOT). He was judged to have a good understanding of the issues related to his offense and what he needed to do to reduce the chances of reoffending. *A concern was raised about his preoccupation and dependence on Islam, to which he converted in 2001, "as a mechanism to guide him through a pro-social life* (emphasis added)"

## FOSTER CARE RECORDS

Child in Need of Protection and Services (CHIPS) Petition - February 23, 1993

On this date, a CHIPS petition was filed by Jodi Timmerman, Assistant Corporation Counsel for Rock County, asking the Court to find that Joshua Van Haften had been the victim of physical abuse and parental neglect, after his mother entered into a voluntary agreement with the Department, placing Joshua and his siblings in foster care.

## PRESENTENCE INVESTIGATION REPORT – RICHARD A. WILLIAMS

### SUMMARY

On October 18, 2014, Joshua Van Haften was charged with Providing Material Support to a Foreign Terrorist Organization. He agreed to plead guilty and is scheduled to be sentenced on February 17, 2017. On September 9, 2015, Mr. Van Haften filed a motion requesting a competency examination. An evaluation

completed by Dr. Ron Nieberding, dated January 29, 2016, found him to be competent to stand trial and determined that he was "sane" at the time of the offense. Although Mr. Van Haften initially requested an evaluation by his own expert, he subsequently withdrew the request and did not contest Dr. Nieberding's findings. On October 20, 2016, Mr. Van Haften entered a guilty plea before U.S. District Judge James D. Peterson and this presentence report was ordered.

PERSONAL & FAMILY INFORMATION

Joshua Van Haften was born on January 15, 1981, in Arlington Heights, Illinois. His parents never married and he did not have contact with his biological father until age 10, when he observed his father walking into a substance abuse treatment facility. He had no contact with his father after that until he was 15 years old and, Mr. Van Haften reported, had no relationship with him until relatively recently, after his incarceration for the present offense. Mr. Van Haften's mother currently resides in Beloit, Wisconsin. She married for the first time when Joshua was approximately seven years old. Her husband was abusive and frequently lashed out at Joshua. Mr. Van Haften reported that he was hit with the belt and verbally abused by his stepfather, who also was physically abusive toward his mother. Mr. Van Haften said that he frequently became disabled because of his stepfather's behavior and often went to the homes of friends for extended periods of time. He stayed away from his mother's home for a period of a week on multiple occasions, because he did not want to be in the presence of his stepfather. His mother and stepfather have two children.

Mr. Van Haften reported that his mother has abused alcohol since he was approximately 10 years old and that on numerous occasions, he and his siblings were taken from her and placed in foster care because of her alcohol problems. Mr. Van Haften said that he and his mother argued frequently and that she hit him with a belt. He acknowledged that he had kicked her on several occasions, in an effort to defend himself. Mr. Van Haften reported that his mother divorced his stepfather and remarried approximately 17 years ago, and that he has a close relationship with her current husband.

Joshua Van Haften spent much of his adolescence involved in the legal system and first was incarcerated when he was 16 years old. He was released at age 23 and in 2000, while incarcerated, converted to the Muslim faith. When he was released from prison, he moved to Beloit and one year later back to Janesville. At that time, he began to attend Muslim religious services and participated in a national conference at which he was exposed to Muslim scholars. He continued his studies and developed a relationship with a woman named Thana Shakir, who he met through a Muslim website. They were married seven months after meeting, but Ms. Shakir dissolved the marriage after three months when she learned of Mr. Van Haften's criminal record and his status as a sex offender.

In 2012, Mr. Van Haften grew increasingly frustrated because of the requirement that he register as a sex offender. *Around that time, he began planning to travel to Egypt because of his feelings of hopelessness and despondency* (emphasis added). In 2013, while in Egypt, he met Nevada Alwadd. She told him that she was a Palestinian and that she had been jailed on numerous occasions. They married in an Islamic contract marriage approximately two months after meeting and have one child together. Abdullah Alwadd, who is two years old, lives with his mother in Sharquia, Egypt. Mr. Van Haften has not spoken with his former wife since 2015.

BACKGROUND

Investigators began looking into Mr. Van Haften's activities in 2012. During an interview with FBI agents on April 23, 2012, he indicated that he believed strongly in numerology and in the prophecies of Mohammed in the Koran. He believes that the Muslim Caliphate will be reestablished in Damascus in the year 2033. He said that Prince William of England is the antichrist and expressed the view that the events of September 11, 2001, were preordained by such people as Nostradamus and that there was a Zionist connection to what happened. He told investigators that if one were to look at the logo for the 2012 London Olympics

and turn the logo upside down it says "Zion," meaning that the Olympics are a Zionist event. He said that he hoped to travel to the Middle East, to learn Arabic and to go on a Hajj. He also said that his status as a registered sex offender causes problems in the United States, preventing him from getting a good job or getting married and that because of this, he may go elsewhere. He was considering moving to Egypt, where he said he has family who would provide him with a place to stay.

One month later, Mr. Van Haften was interviewed by investigators after he was denied entry into Toronto, Canada, because of his criminal record. While there he was overheard saying that there would be an event more horrific than that of September 11, 2001, later that year. The information was relayed to the FBI office in Chicago through the United States Customs and Border Patrol and Mr. Van Haften was questioned on his arrival at O'Hare International Airport. Mr. Van Haften said that he was planning to travel to Egypt, where he hoped to establish residence, so that he could enroll in a university there and pray with fellow Muslims. When questioned about the comments he made to agents in Toronto, he said he believed a horrible event would occur in 2012 and again in 2023, the "harvest of last souls of the world." He said that Muslims would likely be blamed for those events.

Mr. Van Haften said that he learned about Islam while he was in prison, where he became a convert. He said that he has an understanding that others lack and that fellow Muslims did not want to hear about his insights or predictions because they are confusing. He indicated that he did not want to hurt anyone because it would be against his faith to do so.

From August 26, 2014 to October 27, 2014, Mr. Van Haften attempted to provide material support and resources to Al Qaeda in Iraq. In July 2014, an agent of the FBI Madison office interviewed an individual who was a former associate of Mr. Van Haften, who told them that Mr. Van Haften previously had traveled to Egypt, where he had come to the attention of the police, after a woman selling merchandise in a marketplace became uncomfortable with his verbal interaction with her. The woman said that he had taken photographs of a military facility, which is a forbidden practice in Egypt. Because of his contact with police, the United States Embassy in Egypt was notified and Mr. Van Haften's sex offender status was discovered.

On August 26, 2014, Mr. Van Haften left the United States to travel to Istanbul, Turkey and was scheduled to return to Chicago on November 24, 2014. In late September and early October 2014, FBI agents reviewed Facebook posts made by Mr. Van Haften, in which he "liked" posts written by someone who reportedly lived in Raqqa, Syria, a stronghold of ISIL. In October 2014, he "liked" a group thought to be responsible for attacks on Israel and on security service interests in Egypt. On September 23, 2014, Mr. Van Haften posted the following on his Facebook account: "I need to go soon. I tried on Thursday and Friday to get in to tell Abaid, but the stupid Turkish want fuckin' money and Syrians all want money. I don't have any god damn mother fuckin' money." Additional Facebook postings were found on October 10, 14, and 22, 2014.

When agents interviewed Mr. Van Haften's mother, Janice, she allowed them to read chats she had had with him on a social media platform. On September 21, 2014, Mr. Van Haften wrote, "Jerry (sic) talk to you, so if they ask you if you've spoken to anyone about me that's what you have to tell the truth about. If they ask you if you know where I am, tell the truth, that I went to Iraq, to fight the Americans." On April 8, 2015, investigators arrested Mr. Van Haften upon his return to the United States at O'Hare International Airport.

EDUCATION

Joshua Van Haften attended Parker High School in Janesville from 1995 to 1998. School records indicated that he withdrew during his senior year, having earned only 6.25 credits and amassing a cumulative GPA of 0.62. He earned a High School Equivalency Diploma (HSED) in 2001, while incarcerated and a General Education Development (GED) degree through Blackhawk Technical College in 2001. School records indicated that he took courses in interpersonal communication, hazardous materials, psychology, economics, nutrition and mathematics. From 2005 to 2006, he earned 33 credits and obtained a GPA of

3.21.  From September 2008 to March 2009, he attended the Lakeside School of Massage Therapy, a facility that now is closed.

WORK HISTORY

In 1999, Joshua Van Haften began receiving Social Security Disability benefits based on a learning disability.  At the time, he was diagnosed with Impulse Control Disorder, Adjustment Disorder with mixed emotions and conduct and Learning Disorder.  Following his release from prison, he began working in the construction industry, which he did from 2005 to 2007.  From June through August 2008, he was employed as a busser and bouncer at a restaurant in Madison and from 2008-2012, he was self-employed as a massage therapist.  Briefly, between May to July 2012, he worked as a roofing and gutter installer and later that year, reapplied for and was found eligible for Social Security benefits after he was diagnosed with Bipolar Disorder with psychotic/paranoid features and Learning Disability.  In 2014, Mr. Van Haften was employed as a painter and a laborer and between February and April 2014, worked as a laborer for a property management company, a position he left of his own volition.  Between May and July 2014, he worked as a painter, but was terminated by his employer over performance issues.

CRIMINAL RECORD

Joshua Van Haften has a history of delinquency that dates to age 12, when he was charged with Theft on several occasions, each of which was resolved through a consent decree.  When he was 14 years old, he was charged with Disorderly Conduct and adjudicated delinquent.  On September 7, 1995, after having been found delinquent, he received 20 days of home detention as a sanction for rule violations.  On November 1, 1995, he was listed as a runaway and a warrant was issued for his arrest, but canceled the following day.  On November 30, 1995, Joshua was assigned 20 hours of community service as a consequence of the rule violations.  When he was 14 years old, he was adjudicated delinquent on charges of Disorderly Conduct and Retail Theft (two Counts) and in 1997, at age 16, was found delinquent on a charge of Possession of THC and Resisting.

Mr. Van Haften was charged as an adult when he was 17 years old and placed on probation for three years after being convicted of Substantial Battery-Intend Bodily Harm.  Nine months later, his probation was revoked and he was jailed for 12 months with work release.  The incident leading to the charge arose on June 30, 1998, when the victim reported to police that Mr. Van Haften had confronted him regarding the victim dating of his former girlfriend.  According to the victim, Mr. Van Haften pulled a gun out of his pocket, pointed the gun at the victim and struck him on the head with it.

On March 4, 1999, Mr. Van Haften was arrested and charged with Second-Degree Sexual Assault of a Child, after he was accused of having taken had sex with a 15-year-old girl.  He was alleged to have removed her pants without her permission and inserted his penis into her vagina.  After the incident, she attempted to put her clothes back on, but Mr. Van Haften allegedly prevented her from doing so.  When the victim told him that she wanted to leave the house they were in, he drove away with her in a car and had sexual intercourse again, without her consent.  Mr. Van Haften was incarcerated following conviction and served time in prison from 2000-2004.

Following his release from prison, Mr. Van Haften did well for about three years.  However, on May 2, 2007, at age 26, he was charged with Disorderly Conduct after sending a text message to a coworker at Ultra Green Landscaping in Janesville, after having been fired by the company the previous day.  The content of the message was threatening and when interviewed, the recipient said that he had fired Mr. Van Haften for engaging in "very bizarre behavior" while working for the company.  In July 2008, Mr. Van Haften was charged with Retail Theft for which he paid a fine of $250.  On March 19, 2013, at age 32, he was charged with Sex Offender-Failure to Provide Information, for which he paid a fine.

ADJUSTMENT TO SUPERVISION

Mr. Van Haften was fired from a job at Burger King in August 1998, following a fight with another employee. He was cited for Disorderly Conduct and given a formal warning. In October 1998, he and his former girlfriend received disorderly conduct citations while attending Parker High School in Janesville, after they were involved in an argument and pushed one another. Mr. Van Haften was given 30 hours of community service, but failed to complete the assignment because he was ordered to spend 90 days in the Rock Valley Community Program Halfway House in December 1998. His placement in the halfway house grew out of his arrest in November 1998, on a charge of Carrying a Concealed Weapon, Underage Drinking and Possession of Cigarettes by a Minor. While staying in the halfway house, Mr. Van Haften received several incident reports that included destruction of property and banging his head against the wall. He was described as constantly challenging the rules.

INSTITUTIONAL CONDUCT

A report prepared by neuropsychologist William A. Merrick, Ph.D. indicated that Mr. Van Haften had successfully completed sex offender treatment while incarcerated. The discharge summary from the treatment program noted that his focus on Islam as a mechanism to guide him to a prosocial life was of concern. During his institutionalization, Mr. Van Haften participated in individual psychological counseling, where he talked about his conversion to Islam and his desire to always tell the truth. He reported feelings of depression related to his status as a sex offender and said that he saw no purpose in life.

In October 2003, Mr. Van Haften was seen for psychiatric consultation at the Stanley Correctional Institution, after expressing mildly paranoid ideas and indicating that he had been transferred from a previous institution because staff members there were hostile toward him because of his interest in Islam. He also reported that he believed he was being framed when prison staff found a pair of tweezers among his religious and sacred papers. Around that time, he was prescribed Remeron 15 mg to help him sleep, but discontinued the medication after about one month, reporting that it made him feel lethargic during the day.

MENTAL HEALTH HISTORY

Mr. Van Haften reported that he attempted suicide in 2000, by cutting his wrists, while placed at the Rock Valley Corrections Program Halfway House in Janesville. He did so following a meeting with his supervising probation agent, which Mr. Van Haften felt had not gone well. He reported feeling depressed and recalled that he was started on Zoloft and amitriptyline following the incident. Following the suicide attempt, he was hospitalized for two weeks and after discharge participated in group and individual therapy. Mr. Van Haften reported that he attended a few sex offender groups during this time and that over the next 10-12 years, took medications that were prescribed sporadically.

Department of Corrections records indicated that while he was on supervision, Mr. Van Haften was evaluated by a psychologist, Dr. Robert H. Gordon, who diagnosed him as having an Adjustment Disorder with depressed mood and Borderline Personality disorder. Dr. Gordon noted that Mr. Van Haften had attended mental health counseling intermittently and had made poor progress. He hypothesized that Mr. Van Haften would likely continue to engage in impulsive behavior, noting that it was difficult to engage him in counseling because of his hypersensitivity and social avoidance. In 2012, Mr. Van Haften applied for Social Security Disability benefits and was diagnosed with Bipolar Disorder with psychotic/paranoid features and a learning disability. He also was noted to have a history of Oppositional Defiant Disorder and a determination was made that he was eligible for disability benefits.

During a psychological evaluation conducted by Dr. Nieberding in Chicago in 2106, Mr. Van Haften was described as exhibiting an interpersonal style that reflected a highly verbal and often overly detailed presentation. His intellectual functioning was determined to be in the average range and he was described

as manifesting a persistent depressive disorder and antisocial traits. When seen by Dr. Merrick, Mr. Van Haften was diagnosed with Antisocial Personality Disorder and thought to manifest symptoms of Oppositional Defiant Disorder and Conduct Disorder during adolescence. Dr. Merrick noted that he had mild neurocognitive disorder as the result of a traumatic brain injury.

SUBSTANCE ABUSE HISTORY

Joshua Van Haften reported that he began smoking marijuana when he was about 11 years old, noting that he did so sporadically. By the time he was 13, he was smoking twice a week with older friends and continued to do so at that frequency until he was approximately 15 years old, when he was placed in a group home. At age 17, he began smoking marijuana again, at frequencies varying from twice a month and twice a week over the following year. After he was released from prison on 2004, Mr. Van Haften focused on his health, worked out regularly and did not smoke marijuana. However, in 2007, he became depressed following his divorce and over the uncertainty of his future as a consequence of his sex offender status. He continued to follow Muslim practices, but began smoking marijuana again at a frequency of about three times a week and in 2008, after moving to Madison, stopped praying and fell back into his old habits. He traveled to Egypt in an effort to become more involved in his Muslim faith and to stop his drug use, which conflicted with his religious beliefs. However, following his return from Egypt, he began smoking marijuana again and did so on a daily basis until July 2012, when he stopped voluntarily. On his return to the United States in 2014, following his trip to Turkey, he resumed smoking marijuana approximately twice a day.

Mr. Van Haften began using alcohol when he was about 16 years old, drinking twice a month with friends. He reported that he never has been addicted to alcohol, but that when he worked at a bar around age 27, he began drinking three or four times a week. Mr. Van Haften indicated that he had tried hallucinogenic drugs once, in October 2011.

EVALUATION

I met with Joshua Van Haften on two occasions at the Dane County Jail in a conference room in the Public Safety Building. At each meeting, I was accompanied by Tricia Mooney-Fogarty, a social work graduate student working in the office of Federal Defender Services of Wisconsin. At the outset of each interview, I explained to Mr. Van Haften the nature, purposes and limitations of confidentiality in evaluations of this sort. He appeared to understand what I told him and agreed to participate. In response to questions I posed, Mr. Van Haften provided the information that follows.

HISTORY

Joshua Van Haften was born in Arlington Heights, Illinois, where he resided with his parents until he was 4 years old. The family then moved several times, to Aurora, Maple Park and DeKalb, Illinois, where Joshua began school. He attended elementary schools in DeKalb, Sycamore and Lakes Zürich before his family came to Madison during the summer of 1988. From 1990, until he was incarcerated in 2000, he attended middle and high school in Janesville. Following his release from prison in 2004, Joshua returned to Janesville. He moved to Madison in October 2008, where he lived until July 2012, when he left the United States for Egypt.

After arriving in Cairo, Mr. Van Haften moved to Benha, where he taught English for about a year and a half. Although he had opportunities to do construction work and massage therapy there, he spent 25 to 30 hours a week teaching English, relaxing the rest of the week. In January 2014, Mr. Van Haften was deported from Egypt on a warrant from the state of Wisconsin, issued because he had failed to renew his registration as a sex offender.

After returning to the United States, Mr. Van Haften moved to Madison where he stayed with friends, settling in Cross Plains in April. He remained in Wisconsin until October 27, 2014, when he traveled to Turkey. Mr. Van Haften was extradited from Turkey after the United States issued a warrant for his arrest on the charge he faces currently, providing material support to a foreign terrorist organization. Since his return, Mr. Van Haften has spent most of his time in the Dane County Jail, but for a period from October 2015 to January 2016, when he was transferred to the Federal Correctional Facility in Chicago to undergo a competency evaluation.

FAMILY

Joshua is the oldest of his mother's three children. With his stepfather, Woodrow Hooker, she has a son and daughter. Mr. Van Haften's mother, Janice Mae Van Haften, his 58 years old and resides in Beloit. She had worked as a waitress and factory worker, but no longer is employed. Mr. Van Haften described her as a "chronic alcoholic," whose drinking emerged from the abuse she suffered at the hands of Mr. Van Haften's stepfather. She has a history of COPD and was diagnosed with Bipolar Disorder in the 1990s. His mother underwent electroconvulsive therapy (ECT) in 2001, and was treated afterward with medication.

Mr. Van Haften has a complicated family history. Verbal and physical arguments occurred frequently between his mother and stepfather and, on one occasion, Joshua ran away because Woodrow was physically and emotionally abusive. As a result of the physical altercations between them, his mother was hospitalized on at least one occasion and Mr. Van Haften and his siblings were taken out of the home and placed in foster care. Joshua had limited contact with Woodrow after that, but lived with him briefly in 1998, when the court allowed him to do that as an alternative to being placed at Wales after a juvenile court conviction. Woodrow forced Joshua to move out after he stole rent money from the apartment. Woodrow and Joshua's mother have two children, a son, Woodrow, Jr., who is an ironworker and lives in Seattle, Washington and a sister, Katie, who is a UPS delivery person and lives in Milton, Wisconsin. Joshua has maintained contact with Woodrow, Jr. while in jail, but has not had contact with Katie since 2014.

Mr. Van Haften's biological father is Robert Frank Lada. He is 58 years old and resides in West Frankfort, Illinois. A carpenter, they have no relationship. Joshua last saw him in 2011, when he went to Illinois for a visit. On the trip, he recalled, "I brought him a bag of marijuana" that his father had requested. Mr. Lada is an alcoholic and was treated for crack cocaine abuse in the early 1990s. Mr. Van Haften's mother and stepfather are divorced and since 1999, his mother has been in a relationship with Howard Whitledge. Despite the abuse, he experienced growing up, Mr. Van Haften loves his mother and has made an effort to encourage her to have a more positive outlook about life. In addition to his half-siblings, Mr. Van Haften's father had a child with his mother's best friend, a woman born nine years before Joshua. Despite having a relatively large extended family, Joshua has no close relationships with any family members.

EDUCATION

Joshua Van Haften attended Parker High School in Janesville from 1996 to 1999. He was incarcerated following a conviction for sexual assault in March, 1999 and did not graduate. He earned an HSED in 2001 at the Racine Youthful Offender Correctional Facility (RYOC) and during his placement there, was diagnosed with a learning disability. In fall 1998, Mr. Van Haften reported, he was qualified for SSDI because of his learning disability and began receiving payments in 1999, at age 18. Since his incarceration, he has used the money he gets, $980 per month, to make purchases through a canteen card in the jail. He has tried to save as much money as he can and reported that he now has more than $12,000 in an account managed by his mother's significant other, Howard Whitledge.

During the summer of 2005, Mr. Van Haften reported, he enrolled in the Fire Sciences program at Blackhawk Technical College, earning a GPA of 3.2 over four semesters. However, he dropped out of the program after learning that he needed to become certified as an EMT to graduate and would be unable to obtain such certification because of his sexual assault conviction. He switched programs, entering a course

in supervisory management, but dropped out before earning a diploma. From September 2008 to February 2009, Joshua attended classes at the Lakeside School of Massage Therapy from which he earned what he described as a "national license," noting that he is ineligible for a state license because he is a convicted sex offender.

WORK

Between the ages of 11-15, Joshua Van Haften had a paper route, delivering the Janesville Gazette. When he was 16 years old, he took a summer job at a Ponderosa Steakhouse and later worked for a Burger King franchise. After leaving high school in 1999, he was hired at a textile factory, but left after his probation was revoked when he was charged with sexual assault. In 2000, after he was released from jail, he was to be moved into a halfway house, but made a suicide attempt by cutting his wrists, he said, because "the probation officer was so mean." He was transferred to an inpatient psychiatric service in Rock County, where he stayed for two weeks.

From 2000 to 2004, Joshua Van Haften was incarcerated. When he was released from prison, he met a friend he had known in foster care, who gave him a part-time job as a painter and they worked together until 2006. In the summer of 2005, Mr. Van Haften was hired as a laborer/landscaper by Brunsell Construction. He worked for the company on a part-time basis over a three-year period while attending school. In August 2006, he was hired by J.P. Cullen, a construction company, where he did concrete work for about five months. Mr. Van Haften reported that he was fired for what he described as "erratic behavior on the job site," after *he took off his helmet and smacked his head onto a concrete column,* feeling angry because "coworkers were giving me shit." They knew he was a registered sex offender and deliberately made comments to upset him.

In 2007, Joshua got a job with Ultra Green Landscaping, but was fired after two months when a coworker who disliked him told their supervisor that Mr. Van Haften had been speeding and jumping around in the back of the company truck. Joshua returned to the union hall in Janesville and was hired for a summer job, removing asbestos from dormitories at the University of Wisconsin-Whitewater. It was during this time, he said, that he was arrested for retail theft after he went to a grocery store to purchase items for lunch and was accused of eating and failing to pay for one of the items before he left. Later that summer he was sent to work at a school in Delevan, but a supervisor from J.P. Cullen, who was working there and had fired him previously, laid him off. Next, he worked on a remodeling job at a Copps store in Madison, where he worked for about six weeks and continued to get jobs through the labor union until the summer of 2008, when he enrolled at Lakeside School of Massage Therapy.

While attending school, Mr. Van Haften was hired as a clerk at a GNC store, where he worked for six months, until he was let go after the business discovered "missing items." Joshua denied having taken anything while working there. He then began to work on his own, as a massage therapist, initially finding clients on Craigslist. Over time, he said, he amassed a clientele and stopped advertising online. During the course of his work, Mr. Van Haften saw clients in their homes and worked primarily with men, for whom he provided services on multiple occasions. He said that during that period, he worked with two women, but neither invited him to come back for a second massage session. When asked whether he knew why they had not invite him to come back, he said that he did not, noting, "I didn't try to do anything or be disrespectful." Mr. Van Haften closed his massage business in April 2012, before he left to travel to Egypt.

FRIENDSHIPS

Mr. Van Haften appeared to have few friends while growing up and to have had odd relationships with those that he acknowledged. While in first grade in DeKalb, Joshua said, he was friendly with two girls who lived next door, Megan and Sarah. "They wanted to play house and play Nintendo (and) took turns kissing me," he recalled. Sarah, he said, "transmitted a virus to me by kissing me." While living in Lake Zürich, he recalled, he was molested by a babysitter. "I remember her kissing me and having me fondle her breasts."

Although Joshua reported having number of friends while growing up, it was difficult for him to identify more than one or two. When his family lived in Lake Zürich, he was in fourth grade, and attended Bible School, where he met other students, but none stood out as a close friend. After his family moved to Janesville, he made friends with two boys, Doug McKeown and Matt Phillipi, and spent time together with them. Although they were not close in high school, Joshua made contact with them after he was released from prison in 2004.

Growing up, Mr. Van Haften's family had no strong religious affiliation. His mother was raised Catholic, but the family did not attend church regularly. When he was sentenced to prison in 2000, Joshua was placed initially at Dodge Correctional Institution (DCI) for assessment and evaluation, standard protocol for new inmates. While there, he became friendly with the man with whom he shared a cell and who had converted to Islam just six months earlier. It was at that time, Mr. Van Haften said, that he began "thinking deeply about (Islam)." "I can't really tell you specifically," he said, what drew him to the philosophy, observing only that his cellmate had told him that "reverence toward God and the prophets" was part of the teaching. During the four years he spent in prison, Joshua gravitated to and formed friendships with other Muslims.

*Mr. Van Haften began reading the Koran at DCI and when he was transferred to RYOC six weeks later, he already identified himself as a Muslim.* "I practiced (and) I prayed every day." While at the Gordon Correctional Center, he recalled, "I wrote complaints" and was transferred to the Flambeau Correctional Center. During a search of his cell, a pair of tweezers was found among his belongings and he was transferred out of the minimum-security facility to the Stanley Correctional Institution, a medium security prison. During his incarceration, Mr. Van Haften befriended other inmates, some of whom were Muslim and others who were not.

RELATIONSHIPS & MARRIAGES

Joshua Van Haften has had few close relationships with women. During high school, he said, he "dated" a bit, but appeared not to have formed any close connections until he met a girl named Lacey, with whom he was involved for about six months. Their relationship ended after Mr. Van Haften became involved in a fight with another young man during which Joshua produced a weapon that he described as a "fake gun," with which he struck the other man. He was arrested and charged with assault, after which Lacey terminated the relationship.

Mr. Van Haften's next significant relationship developed in 2006, when he became involved with Thana Shakir, a woman he met online through a Muslim website. She lived in New York state and they communicated initially online and by telephone. Mr. Van Haften liked her because she was Muslim, had a pretty face, wore a hijab and appeared to be devout. Without ever having met him, Ms. Shakir moved to Wisconsin to marry him in July 2006. Although he did not know her well, Mr. Van Haften determined that she was the "right person" for him and they were married in Janesville under what he described as an "Islamic Contract." They did not seek a marriage license, Mr. Van Haften said, because he was fearful that his status as a registered sex offender would interfere with his ability to be married.

Mr. Van Haften's marriage to Ms. Shakir ended after three months, after which he became depressed. *"I just decided," he said, "(that) I'm not fit to be in a relationship in the U.S. because of the "ramifications of being a sex offender." Ultimately, he decided to leave the United States, he recalled, because he no longer wanted to be viewed as a sex offender and thought that this was the only lens through which he would be seen in the United States.*

Toward the end of 2007, Joshua Van Haften was introduced to a woman named Tanille Nelson by a mutual friend. They dated for nine months during which Joshua moved in with her. The relationship ended because, he said, she felt that he was not really attracted to her. When he moved to Madison, Mr. Van Haften began dating again and had a five-month relationship with a woman thirteen years older than he, a school secretary he met on a worksite when he was doing construction. She ended the relationship, Joshua

said, because "she thought I wasn't as attracted to her as I should have been." After that relationship ended, he was not involved with anyone until he went to Egypt in July 2012.

While in Egypt, Mr. Van Haften met a woman on his way to prayer one day, after he was approached by her six-year-old daughter, asking for money. The woman, whose name was Nevada, was a Palestinian and spoke English. At their first meeting, he gave her money to pay rent on an apartment. They met again ten days later, he asked her to marry him and they were wed two weeks later. Mr. Van Haften said that he was drawn to her "because she was Palestinian and didn't have anyone in her life." They were married in July 2013, one week after the coup d'état in Cairo. Nevada became pregnant in September and gave birth to a son in May 2014, a child Joshua never has seen. Since then, he has not been involved in an intimate relationship.

NUMEROLOGY

To better understand the role numerology in his life, I asked Mr. Van Haften what had drawn him to it, but his explanation was difficult to follow. He said that he had become interested during the summer of 2009, after watching the video series entitled *The Arrivals*, which he described as a series about Christ, Mary and their association with Islam. The videos are described elsewhere as a series of conspiracy theory videos related to Islam that often is shown to young Muslims and contains a great deal of speculative information.

Mr. Van Haften described numerology as "the synchronicity of things," indicating that he is attracted to it because, "It sheds light on things that could happen in the future in a general way." He noted that he is currently going through a year "8," which he characterized as his "success" year, because of he is anticipating a successful path for his life.

RELIGIOUS BACKGROUND/AFFINITY FOR ISLAM

As a child, religion was not a significant part of Joshua Van Haften's life. Although he recalled that his mother had expressed a belief in God and had taken him to church and Bible School, he felt no strong religious connection. Each evening, a prayer was said at the dinner table, at his mother's behest. The family celebrated Christmas and Easter and his mother spoke of God at home. In contrast, his stepfather, Woodrow Hooker, was not religious and never spoke of God when Joshua was growing up. *Mr. Van Haften's decision to embrace Islam appears to have derived from a desire to find principles to guide his life, rather than from a wish to seek a religious affiliation.*

Mr. Van Haften said that if he were released from prison, he wanted to return to Egypt. He indicated that when he went there initially, he was interested in becoming part of a militant resistance, noting that his beliefs have changed since then. If he were able to return, he said, he would want to do so for the purpose of meeting people and becoming part of a community.

LEGAL

Joshua Van Haften has a history of juvenile delinquency as well as an adult criminal history that dates to 1998, when he was 17 years old and was convicted of Substantial Battery after striking a young man with what he described as a "fake gun" in front of the home of the woman he was dating. He was placed on probation after the incident and was stopped by police one night when he went to a party with his brother. Officers found him to be in possession of a knife, which was prohibited by the rules of probation, and Mr. Van Haften was placed a in halfway house for a time and later allowed to live with his mother.

In 1999, not long after his eighteenth birthday, Mr. Van Haften met a 15-year-old girl he knew in passing when he was in high school. She and a friend had skipped school that day and he invited them to his house for the afternoon. While they were together, Joshua offered to bring them to a party he planned to attend over the weekend. The young woman gave him her phone number and on Saturday night, while at the

party with a friend, Joshua telephoned and invited her to join them. He and his friend, Adrian, had been drinking beer and smoking marijuana and after the phone call, Adrian drove to the girl's house, picked her up and brought her back to the party. Joshua was with her in a room with others at the party and as people began to leave, she and Joshua remained and, eventually were alone in the room. They began kissing and Joshua began to fondle her breasts. He took off her pants, pulled down his own and put on a condom. "She was sitting on top of me," he recalled. "We were having sex for several minutes," when Adrian returned. They stopped their sexual encounter and the young woman put on her clothes.

Joshua recalled that he and the young woman then went outside and smoked a cigarette. Together, they got into the backseat of Adrian's car and had sex again, with Joshua using the same condom he had earlier. When they stopped, Adrian got into the car and they drove the young woman home. Because she was late getting there and was on home detention, the police were sent to look for her. When they arrived, the girl told officers that she had been raped by Joshua and he was charged.

Following his arrest and conviction, Joshua Van Haften was sentenced to prison and his named placed on the Wisconsin Sex Offender Registry for life. Mr. Van Haften has had a very difficult time adjusting to being designated a registered sex offender. He has asserted that the encounter was consensual, has been shunned by people who have learned of his status and humiliated by people who know him. He understands that his name never will be removed from the registry. "My life could have been totally different," he said. "I could have been a firefighter." The impact of having been listed on the Sex Offender Registry and the ways in which it affected relationships with people he knew in the past and his ability to form relationships in the future was a significant factor in his decision to leave the United States.

PAST MEDICAL HISTORY

Mr. Van Haften described his current health status as "great," and he noted that he is taking no medications at the present time. In the past, he has taken amitriptyline and Remeron for sleep and was placed on Zoloft in 2000, following a suicide attempt prior to entering prison. The only hospitalization he identified was a one month stay at Mercy Hospital in Janesville at age thirteen after he was struck by a car while riding his bicycle. As a result of that accident, he sustained fractures to his left femur, left shoulder and jaw. He reported having been comatose for three weeks and having sustained a traumatic brain injury (TBI). Although he noted that his physicians believe that he did not suffer any permanent residuals as a result of the head injury, Mr. Van Haften recalled people telling him that after the accident he was "a different person."

AODA/MENTAL HEALTH HISTORY

Mr. Van Haften reported that he began to use alcohol when he was 15 years old. Initially, he drank sporadically, but by 2007, was using regularly, "enough to have a buzz." Over time, his drinking increased and he reported having been drunk "every weekend" until his junior year of high school, when, he said, he tried to develop a "different lifestyle." The last time he was drunk was in 2014, shortly before he left the United States for Turkey. In addition to alcohol, the only other drug he has used regularly is marijuana. From age thirteen to nineteen, when he went to prison, he got high regularly. Beginning in 2006, after he had been out of prison for almost two years, he got high virtually every day. In 2012, while living in Egypt, he did not use marijuana, but began again in 2014, when he returned to the United States, continuing to use until he left for Turkey in August 2014. While in prison from 2001-2002, Mr. Van Haften participated in required AODA treatment, but otherwise has had no treatment focused on alcohol or drug abuse.

While he was growing up, Joshua recalled, he was criticized frequently by his stepfather and in response to the criticism, became "hypersensitive," punishing himself following such criticism by hitting himself. The pattern of self-flagellation has persisted, he noted, and through much of his life he has done so when he is upset. When Woodrow, his stepfather criticized him, Joshua recalled, he struck himself in the face. In school, he said, sometimes he tried to choke himself in an effort to pass out when he was being questioned by teachers or counselors. While he was living in Turkey in 2014, he was having difficulty sleeping, he

recalled, and "started smacking myself against the wall," and doing the same thing when he was in custody at the immigration center in Turkey.

Joshua Van Haften has had limited mental health treatment. In 1983, while in school, he was seen at the Janesville Counseling Center after he was picked up for stealing clothes from a Walmart store and turned in by his foster parents. While in prison, he participated in a Sex Offender Treatment (SOT) program at RYOC and in group SOT treatment through the Janesville Probation Office after his release from prison, from 2004-2006. In addition, in 2005, he took part in a few sessions of outpatient psychotherapy on the recommendation of his parole officer. Since 2006, Mr. Van Haften has had no mental health treatment.

JOSHUA VAN HAFTEN'S DESCRIPTION OF EVENTS THAT LED HIM TO GO TO EGYPT AND TURKEY

In April 2012, Mr. Van Haften attempted to travel to Egypt, but was "turned around" in Toronto because of his sex offense history. He returned to Madison, lived with a friend for a few months and in July 2012, flew to Egypt through Rome. In Egypt, he got a job teaching English, which he did from October 2012 to August 2013. While living in Egypt, he spent time in a mosque and studied Arabic. In August 2013, a professor for whom he was working offered him a job as a fitness trainer and massage therapist. Joshua declined the offer, wanting to control his free time, but continued to teach English until January 2014, when he was taken back to the United States. Between the time of his return and August 2014, he worked for friends as a painter and laborer, stopping in August 2014, when he traveled to Turkey.

After arriving in Turkey, he slept on the street for a couple of nights before he met a man who helped him find a place to stay in a hostel. He did not work at any time during his stay in Turkey, but while there, posted messages on Facebook that contributed to the charges he now faces. Mr. Van Haften denied ever having been in contact with anyone who wanted to have him engage in terrorist activities, but he acknowledged having attempted to make such connections. *"I wanted to be accepted so I had to put on a façade," he recalled. "I had to show a lot of enmity for the people I grew up with."*

When asked to explain why he had traveled to Turkey, Mr. Van Haften said, "I wanted to go there. I wanted to experience this - see these people and see if they were authentic." He expressed incredulity, noting, "I couldn't believe that people would really do that. As soon as they were declared a caliphate (June 29, 2014), I wanted to see how real it was." Mr. Van Haften offered that he would *not* have fought against the United States if the opportunity had arisen. *He described his desire to go to Turkey as having emanated from "an adventurous spirit," and noted that when he discovered what was going on no longer wanted to be there.* Mr. Van Haften views the prophecies of Islam as predictive of what will happen in the future. His belief in Islam and numerology appear to represent mechanisms through which he has tried to find an identity and *has looked to prophecy for guidance much of his life.*

MENTAL STATUS EXAMINATION

On informal mental status examination, Joshua Van Haften appeared oriented to time, place, person and situation. Initially, he appeared to maintain distance, sharing information cautiously, but became more open as the interviews progressed. During the course of the meetings, evidence of mildly pressured speech as well as a moderately high level of energy was noted. His affective range appeared limited and a noticeable absence of a sense of humor was evident. From time to time, his thought processes appeared concrete and in his responses, he frequently repeated words and phrases he had spoken in answer to previous questions.

Mr. Van Haften described his sleep as good, only "if I stay up all day and there are no interruptions." He denied difficulty falling asleep, but noted that he is easily awakened by any noises during the night. He described himself as having a "voracious appetite," noting that he has gained 25 pounds since he was jailed. He indicated that he has a high level of energy and said that he has spent most of his waking hours in jail reading. Memory for recent and remote events appeared good as did his ability to concentrate.

Thought processes were logical and goal-directed, without evidence of psychotic determinants. Indicators of the presence of hallucinations, delusions or ideas of reference were not seen. Insight and judgment appeared fair.

TEST FINDINGS

To provide additional information about his personality and functioning, I asked Mr. Van Haften to complete two psychological tests, the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the Millon Multiphasic Personality Inventory-III (MCMI-III). Mr. Van Haften's responses to the MMPI-2 indicated that he had been able to read and understand the questions and match the item numbers in the question booklet with the answers on the answer sheet. He responded in a manner that suggested a tendency to minimize the presence of psychological problems and presented himself in a mildly self-favorable way. Nevertheless, validity scales indicated that the profile was valid and interpretable. The clinical profile suggested the presence of significant paranoid personality features and the possibility of a borderline psychotic condition. When he feels threatened, he is likely to respond in an agitated manner and, when he feels trapped, to act out in self-centered ways. His judgment appears uneven; occasional lapses of forethought and problems with impulse control are likely. Individuals with similar profiles demonstrated a vulnerability to problems with alcohol and drugs, which might offer them immediate relief from the tension they experience.

Individuals with this profile type often appear suspicious and prone to grossly misinterpret events they witness. Although likely to remain reality-oriented, they are apt to respond to distorted beliefs. Mr. Van Haften's responses indicated that he is apt to project his angry feelings onto others and to overreact when events occur that confirm his projections. He is likely to appear resentful and irritable and the outward apathy he presents may conceal the intensity and depth of his feelings of resentment. Family stress, a need for affection and attention and an oversensitivity to demands put on him are common problems observed in individuals with this pattern. Diagnostically, the profile is seen in individuals who manifest paranoid states and sometimes paranoid schizophrenic presentations. In addition, diagnoses reflecting the chronic abuse or dependence on alcohol or drugs also are indicated.

Mr. Van Haften's responses on the MCMI-III yielded a profile suggestive of a mildly to moderately severe level of dysfunction. He appears to live a run-of-the-mill existence, filled with feelings of discontent. He reports numerous fears, mental distractibility and fatigue symptoms, often seen in an anxiety disorder. He appears filled with self-doubt, expects the worst from the world and repeatedly fails to take advantage of opportunities to make his life better. The profile also suggests that he is dejected and depressed. He appears to dread being isolated and feels as though he is without support. Although he would like to be close to others, he anticipates being disillusioned by them. He lacks self-esteem and appears to expect to fail in life. Because nearly every avenue of gratification he has sought has failed, he has become increasingly isolated. Anticipating that others will abandon him, he tends to withdraw from potentially supportive individuals only to experience the disappointment he anticipated. Diagnostically, the profile is seen in individuals with Generalized Anxiety Disorder and the presence of avoidant, depressive and borderline personality features.

SUMMARY & CONCLUSIONS

Joshua Van Haften is charged with knowingly attempting to provide material support and resources to a foreign terrorist organization. The charge arose out of attempts he made to take part in and to encourage others to participate in terrorist activities to assist ISIL. This evaluation was undertaken to offer the Court a psychological profile of Joshua Van Haften that it might consider in reaching a determination regarding sentencing.

The examination consisted of a review of the Indictment and a memorandum prepared by Mr. Van Haften's attorney, Joseph Bugni, addressing the Terrorism Enhancement under consideration. In addition, I reviewed the report of a neuropsychological evaluation conducted by William A. Merrick, Ph.D. in April

2016; reports of psychological evaluations conducted at the request of the Social Security Administration in 1999 and 2012; medical records from the Department of Corrections; foster care records; a Presentence Investigation Report prepared by Richard A. Williams; a clinical interview with Mr. Van Haften and the administration of psychological testing. A summary of the information gathered can be found in the body of the report, above.

An appreciation of Joshua Van Haften's psychological makeup begins with an understanding of the family in which he grew up. Mr. Van Haften's parents were not married and his biological father played no role in his upbringing. His mother has a history of Bipolar Disorder and in 1987, married his stepfather, Woodrow Hooker. Throughout Mr. Van Haften's childhood, Mr. Hooker was physically and emotionally abusive to Joshua's mother, to him and to his two half-siblings. From 1992-1996, Joshua was seen for counseling after getting into trouble in elementary school. In 1993, he and his siblings were placed in foster care when their mother voluntarily gave up parental rights temporarily, after which Joshua had very limited contact with his stepfather. Frequently criticized and punished physically by his stepfather, Joshua developed a very poor self-image and became self-abusive when he was upset, hitting himself, striking himself on the face and, on at least one occasion, choking himself at school. In 1998, Joshua began to receive SSDI after he was diagnosed with a learning disability. He attended Parker High School in Janesville, leaving during his senior year, after he was convicted of second-degree sexual assault of a child. He was sentenced to prison and his name placed on the Sex Offender Registry for life. Incarcerated from 2000-2004, he earned an HSED while in prison. Joshua used both alcohol and marijuana as a teen. Although he denied having had a substantial problem with either, he underwent AODA treatment in prison as well as Sex Offender Treatment.

After his release from prison, Joshua enrolled at Blackhawk Technical College, where he worked toward a degree in Fire Sciences. He did well, but dropped out after learning that he needed to be certified as an EMT to graduate and that he would be unable to earn the certification because of his sex offender status. In 2008, he enrolled in a massage therapy school and, after completing the program, obtain what he described as a "national license," noting that he was ineligible for licensure in the state because of his sex offender status. His work history includes a job delivering newspapers that began when he was 11 years old and work at fast food restaurants as a teenager.

In 1998, while junior in high school, Joshua was convicted of Substantial Battery and placed on probation. Sometime after that, he was stopped by a police officer and found to be in possession of a knife, in violation of the rules of probation. He was placed in a halfway house for a time and then allowed to return to his mother's home. In 1999, soon after he turned 18, Joshua met a girl he had known in high school. The following weekend, he called to invite her to a party. At the party, Joshua and the young woman had what he described as consensual sex. When the evening ended, Joshua and his friend drove the young woman home. She was on home detention at the time, and because she had failed to arrive by curfew, the police were called to look for her. When they spoke with her about what had taken place that evening, she told them that Joshua Van Haften had raped her. Consequently, he was charged and convicted of Second-Degree Sexual Assault of a Child, imprisoned for four years and required to register as a sex offender for the rest of his life.

Mr. Van Haften has had a great deal of difficulty coping with the effects of being a registered sex offender. He views his conviction as an injustice, arguing that the sexual encounter had been consensual. Nevertheless, he recognizes that what he did was criminal because she was 15 years old and he was 18. He believes that the young woman lied to the police about what had taken place to avoid sanctions after arriving home after curfew while she was on home detention. The impact of having been placed on the Sex Offender Registry for life has been devastating for Mr. Van Haften. His sex offender status led to ridicule and threats from others; it has caused him to feel estranged from friends and family and interfered with his ability to become a firefighter, something he had wanted very much to do.

Psychological testing suggested the presence of paranoid personality traits. Mr. Van Haften is suspicious and distrustful of people and appears prone to misinterpret their motives. He is likely to become agitated when he feels cornered and to exercise good judgment unevenly. He is apt to feel resentful and to misinterpret the motives of others, sometimes responding in an aggressive manner. A desire for affection and appreciation from others is apt to be unrequited. Mr. Van Haften appears bored and unfulfilled. He believes that avenues to achieving success have been blocked and his self-image is very poor. He appears unable to find the gratification he would like in interpersonal relationships.

Joshua Van Haften's sense of estrangement and alienation appears to have been nurtured after he entered prison in 2000, and to have grown since then. Believing that he had been abandoned by his family growing up and that he had been wrongfully convicted of sexual assault, he withdrew from contact with others. In prison, though it was difficult to do, he tried to hide his status as a sex offender because of the wrath he anticipated from other inmates and from staff. When he first came to prison, he looked to Islam to provide him with a new identity and a set of rules he could follow. Treatment notes during his incarceration indicated that as early as September 2001, he expressed a desire to leave the United States, move to an Islamic country and that he drew guidance from the Koran. Dr. Pamela Ross Mahnke, who saw Mr. Van Haften in psychotherapy at that time, noted that he reported feeling depressed, said that he had no friends, believed that family members had distanced themselves from him and that he no longer had a purpose in life. Dr. Mahnke characterized Joshua as trying to improve his life by following the percepts of Islam. *He told her that he was going to become involved with different religions "to fulfill a need to be liked, have friends and belong."* Mr. Van Haften always has had difficulty getting along with others. As a child, he was diagnosed with Conduct Disorder and Oppositional Defiant Disorder. As an adult, he has been diagnosed with Adjustment Disorder with depressed mood, Borderline Personality Disorder and Bipolar Disorder.

Mr. Van Haften developed and maintained a belief in Islam while in prison and was drawn to individuals he viewed as providing a path for him to follow. Looking for other sources for guidance, he was drawn to the occult, looking both to numerology and astrology for guidance and later to a radical form of Islam. He advocated extremist Islamist views in social media and reinforced such views in others, continuing to draw support from his identity as a Muslim and his affiliation with Islam. Believing that his life not only had come to a standstill after he became a registered sex offender, allowing him no clear path to redemption, he looked to change the environment in which he lived and began to explore connections to Islam outside the United States, first in Egypt and later in Turkey. In each, he tried unsuccessfully to establish a new life, to find a relationship and to find a new path for himself, only to be discovered and returned to the United States each time, ultimately leading to the current charge in April 2015.

On the basis of the information described in the body of the report, I have reached a number of conclusions, which are described below. All opinions, unless otherwise noted, are held to a reasonable degree of professional probability.

1.  Joshua Van Haften was raised in a physically and emotionally abusive environment. His mother likely suffered from Bipolar Disorder and abused alcohol. Mr. Van Haften meets criteria for a diagnosis of Bipolar Disorder and manifests characteristics of Borderline Personality Disorder. He has a history of traumatic brain injury as well as at least one suicide attempt. Throughout his life, he has had great difficulty forming and maintaining relationships. This is likely the result of the combination of factors described, above.

2.  As someone who had tried unsuccessfully to find his identity through his teen years, attempting to make his way through the maze of adolescent options, his conviction for sexual assault and placement on the Sex Offender Registry for life abruptly truncated the options available him. What avenues might have allowed him to establish relationships with others and to develop work skills were halted abruptly. His poor self-image deteriorated further as he came to recognize the impact of being identified as a sex offender and the choices he made reflected what he perceived as a lack of viable options.

3. Mr. Van Haften saw Islam as a set of rules to live by, allowing him to begin to develop a new self-image and form new relationships. A lack of other close relationships drew him to other Muslims, first in prison and later, in the community. While he professed an understanding of the principles of Islam, it is not clear, in fact, that he did. Although he did not grow up in a religious household, Islam appears to have provided him with an identity and a direction, though not a religious calling. His Islamic faith became his identity and through social media, he was drawn to the activities of terrorists in ISIS, which offered not only a set of rules to follow, but a homeland in the form of a "caliphate," and the belief that its members shared his newly developed ideals. In addition, it might, unconsciously, allow him to discharge the anger he harbored having been designated a sex offender for life.

4. Joshua Van Haften's decision to become a Muslim and his desire to become affiliated with ISIL, a group he believed to represent the antithesis of American values, was predicated on the notion that he had been mistreated by the legal system, which he believed was preventing him from becoming successful in life. He believed that ISIL and what it stands for would support and accept him and would overlook his sex offender status. His overarching motivation was to find a philosophy in which he could believe that would provide a path for him in the future and allow him to overcome the pain and losses he had experienced in childhood and the lifelong impact of being listed on the Sex Offender Registry.

Thank you for asking me to examine Joshua Van Haften. Please let me know if I can provide anything additional.

Sincerely,

Michael J. Spierer, Ph.D.
Psychologist