UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

              Plaintiff,

 -vs-                           Case No.   15-CR-37-JDP-1

JOSHUA VAN HAFTEN,              Madison, Wisconsin
                                 February 17, 2017
              Defendant.        1:02 p.m.
_____

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                  Office of the United States Attorney
                  BY:   JOHN VAUDREUIL
                        JEFFREY ANDERSON
                  222 West Washington Avenue, Suite 700
                  Madison, Wisconsin  53703

                  U.S. Department of Justice
                  National Security Division
                  BY:   LOLITA LUKOSE
                  950 Pennsylvania Avenue, NW
                  Suite 2535
                  Washington, D.C.  20530

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

APPEARANCES CONTINUED:
For the Defendant:

                        Federal Defender Services of Wisconsin
                        BY:   JOSEPH A. BUGNI
                        22 East Mifflin Street, Suite 1000
                        Madison, Wisconsin  53703

Also appearing:   JOSHUA VAN HAFTEN, Defendant
                  RICHARD WILLIAMS, U.S Probation Agent

***

## INDEX OF WITNESSES

<u>DEFENDANT'S WITNESSES</u>              <u>EXAMINATION</u>                          <u>PAGE</u>

  MICHAEL SPIERER        Direct Examination by Mr. Bugni        19
                         Cross-Examination by Mr. Vaudreuil     27
                         Redirect Examination by Mr. Bugni      35
                         Recross-Exam by Mr. Vaudreuil          37

***

14        (Proceedings called to order at 1:02 p.m.)

15            THE CLERK:  Case No. 15-CR-37-JDP-1, *USA v. Joshua Van*

16   *Haften*, called for sentencing.  May we have the appearances,

17   please.

18            MR. VAUDREUIL:  The United States Attorney John

19   Vaudreuil, Your Honor, First Assistant United States Attorney

20   Jeff Anderson, and Lolita Lukose from the National Security

21   Division from the United States Department of Justice for the

22   United States.

23            THE COURT:  Good afternoon to all of you.

24            MR. BUGNI:  Your Honor, Joe Bugni, Federal Defender

25   Services, appearing on behalf of Joshua Van Haften.

1          THE COURT:  Mr. Van Haften, Mr. Bugni, good afternoon

2     to you.

3        All right.  So let's start this way.  Let me just do a

4     rundown of the materials I have looked at in connection with the

5     sentencing.  We've got a couple of wrinkles we have to address

6     here, but let's just run down the materials.

7        So -- also, by the way, Mr. Rich Williams is in the

8     courtroom with us.  He's the author of the presentence report,

9     which is one of the things I have reviewed.  That's the

10    presentence report.  I have got objections and submissions from

11    both sides regarding some clarifications from the defendant and

12    the objection to the terrorism enhancement, which I have already

13    ruled on.  I've got the addendum to the presentence report and

14    the revised presentence report, and I have sentencing memoranda

15    from both sides, and Mr. Bugni's sentencing memorandum has

16    several attachments, which I have also reviewed.

17       So with that, let's make sure I didn't miss anything.

18    Mr. Vaudreuil, are you on point here for your side today?

19            MR. VAUDREUIL:  Yes, sir.

20            THE COURT:  All right.  Did I get everything you

21    submitted?

22            MR. VAUDREUIL:  Yes, sir.

23            THE COURT:  All right.  Very good.  Mr. Bugni?

24            MR. BUGNI:  Got everything.

25            THE COURT:  Am I missing anything?  All right.  Very

1    good.  Okay.  Mr. Van Haften, let's handle this right now.  I

2    need to make sure that you read the presentence report and that

3    you discussed it with your attorney.  Have you done that?

4             THE DEFENDANT:  Yes, sir.

5             THE COURT:  Okay.  And have all of your concerns with

6    what's in the presentence report been conveyed to me?

7             THE DEFENDANT:  Correct.  Yes, they have.

8             THE COURT:  Nothing else you want to address about the

9    presentence report?

10            THE DEFENDANT:  No.

11            THE COURT:  Okay.  Very good.  All right.  So let's

12   deal with the problem that was the subject of my short order

13   yesterday.  First of all, let me check in with counsel.  Is

14   there any objection to my handling it the way I proposed, which

15   is to address the fact that the plea agreement and the plea

16   colloquy did not properly disclose to Mr. Van Haften what the

17   maximum term of supervised release is.

18            MR. BUGNI:  That's correct, Your Honor.  We have no

19   problem with the way you're handling it.

20            THE COURT:  Mr. Vaudreuil?

21            MR. VAUDREUIL:  Neither do we, Your Honor.

22            THE COURT:  Okay.  Very good.  Okay.  Mr. Van Haften,

23   when you changed your plea to guilty, we went over the maximum

24   penalties that you might face, and we had the term of

25   incarceration right -- the maximum term of incarceration is 15

```
 1    years -- but the plea agreement and my interview with you
 2    indicated that the maximum term of supervision was 3 years.
 3    Actually the maximum term of supervision is up to the rest of
 4    your life.  Because I didn't go over that with you accurately at
 5    the time of your plea hearing, I want to make sure that that's
 6    clear to you now, and because it's different from what our
 7    discussion was when you pled guilty, I'm going to give you a
 8    chance to withdraw your plea if that's what you want to do.  So,
 9    first of all, let me make sure that you understand that the
10    actual maximum penalty that you could face is the 15 years
11    incarceration plus that could be followed by a term of
12    supervised release that would be up to the rest of your life.
13    Do you understand that?
14            THE DEFENDANT:  That has been clarified with me, and I
15    do understand that.
16            THE COURT:  Okay.  So in light of that clarification,
17    would you like to withdraw your plea of guilty?
18            THE DEFENDANT:  No, sir, I would not like to withdraw
19    my plea.
20            THE COURT:  Okay.  So even with that clarification,
21    you're still prepared to plead guilty facing the additional term
22    of -- the potential for a much longer term of supervision; is
23    that right?
24            THE DEFENDANT:  That is accurate.
25            THE COURT:  Okay.  All right.  Thank you, Mr. Van
```

1    Haften.

2        Okay.  So I will find that the defendant has been clearly

3    and accurately apprised of the penalties that he will face and

4    has decided to persist in his plea of guilty.

5        So I will accept the plea agreement on the basis of my

6    findings that the offense of conviction adequately reflects the

7    defendant's criminal conduct and that the plea agreement does

8    not undermine the statutory purposes of sentencing.  In

9    determining the defendant's sentence, I will take into

10   consideration the advisory sentencing guidelines and the

11   statutory purposes of sentencing that are set forth in Title 18

12   of the United States Code at Section 3553(a).

13       All right.  I'm just going to make a record of the guideline

14   calculations.  There was an objection to the application of the

15   terrorism enhancement, but I ruled on that after briefing from

16   both sides in a written order that I issued a week or so ago.

17   So here is where we are on the guidelines.  The guideline for a

18   violation of the offense of conviction, which is Title 18,

19   United States Code, Section 2339B(a)(1) is in guideline section

20   2M5.3.  The base offense level is 26.  There are no other

21   Chapter Two adjustments that apply, but for the reasons stated

22   in my order on the terrorism enhancement, I find that the

23   present offense is a felony that involved or was intended to

24   promote a federal crime of terrorism.  Therefore, 12 levels are

25   added to that base offense level.  I believe the government is

1    prepared to move for one additional level of downward adjustment

2    for acceptance of responsibility; is that correct?

3         MR. VAUDREUIL:  Yes, Your Honor.

4         THE COURT:  Okay.  I'll grant that motion, which means

5    that Mr. Van Haften gets three levels of downward adjustment for

6    acceptance because of his timely plea and the government's

7    motion.  So after that three-level adjustment then, we land at a

8    total offense level of 35 and a criminal history category of VI,

9    which is also the result of the application of the terrorism

10   enhancement.  Mr. Van Haften would otherwise have a lower

11   criminal history category.

12        So the guideline imprisonment range would be 292 months to

13   365 months, but the statutory maximum for this crime, maximum

14   term of incarceration, is 180 months, so that means that that is

15   the guideline range, 180 months.  Okay.  So that's where we land

16   on the guidelines, and those guidelines I will consider, but I

17   have to consider all the 3553(a) factors in figuring out what an

18   appropriate sentence would be.  So Mr. Vaudreuil.

19        MR. VAUDREUIL:  Thank you, Your Honor.  As set out in

20   the government's sentencing memorandum, we do recommend the

21   statutory maximum sentence of 15 years in prison, and we believe

22   it's supported for several reasons, and I won't go through in

23   any great detail what we said in our sentencing memo, but just a

24   couple of points.

25        He made things very clear.  The defendant's statements both

1    to friends, family, and online made clear his anger at the

2    United States in no small part because of his anger at having to

3    register given his sexual assault conviction from Rock County.

4    He made clear his intent to travel, his intent to fight with

5    ISIL against the United States, and he made it clear to friends,

6    family, and online that he was willing and intended to kill

7    Americans and their allies if that came up.

8         Significantly then, he acted.  It's not a crime in this

9    country to espouse views and to spout them on the internet, but

10   he acted.  He traveled to Turkey.  He tried on at least a couple

11   of occasions to cross the border into Syria to join ISIL, and

12   then, perhaps even most significantly, while in Turkey he

13   assisted -- tried to assist Leon Davis, another American, to

14   come from Georgia, come to Turkey, cross to Syria to join to

15   ISIL -- to travel to ISIL-controlled territory.  This is not a

16   case of just a defendant who spoke in angry terms online, the

17   so-called sort of Facebook muscles, people bragging and talking.

18   This is a crime of action.  So we believe that Mr. Van Haften's

19   intent, his words, and his actions support the 15-year sentence.

20        I want to briefly address the sentencing memorandum

21   submitted by Mr. Bugni on behalf of his client.  It very

22   carefully sets out the defendant's difficult upbringing.  It

23   sets out his social, family, and psychological issues, and it

24   explains and takes that upbringing and how it led him to

25   discontent, anger, isolation.  We don't disagree with those

1    facts.  They're set out very accurately in the PSR that was

2    submitted to the Court, but we do part ways on the meaning of

3    those things in this case.  As we said in our sentencing

4    memorandum, rather than mitigating, we see his angry, troubled,

5    frightening mindset, his anger and hatred of his home country,

6    his world view, his conspiracy theories, we see those as

7    aggravating because we believe that mindset has in the past, and

8    there's no reason to doubt it still does, makes him dangerous.

9        Quite frankly, as set out in the sentencing memorandum, his

10    views and anger are frightening.  He shares these with many

11    other individuals, just reading the newspapers and what we all

12    know, people who plan and often commit acts of extreme, violent,

13    horrible actions.  He has already acted on those views.  He's

14    acted on his anger.  He's acted on his world views, his

15    frightening views, because he did, in fact, travel.  He did, in

16    fact, get to the Syrian border, and he was ready to follow

17    through with violence.  So fundamentally we recommend the

18    15-year sentence because, given his views, given his anger, his

19    isolation, we believe that sentence will protect the public from

20    him acting again in at least that time period.

21        A couple other things I would just address from the

22    sentencing memorandum filed by the defense.  There's some

23    comparisons in the -- or attempted comparisons in the memorandum

24    to the prosecution of Abdullahi Yusuf in the district of

25    Minnesota, a young man who was sentenced in December 2016 to a

1    year and slightly more, eight months, in prison, again for

2    attempting to provide material support.  And the Court was

3    provided with Judge Davis's sentencing order as well as some

4    media reports.

5        I only comment on this because it is our view that it is not

6    comparable in the least, and if one does look at it as any sort

7    of a comparison case, it only serves to be more aggravating in

8    the case of Mr. Van Haften.  Abdullahi Yusuf was an 18-year-old

9    young Somali individual from the Twin Cities area.  With several

10   other Somali youth, together they fed on each other, they

11   supported each other, and then they decided to fight and leave

12   the country and fight with ISIL.  As set out in the press report

13   attached to the memorandum, it accurately describes them as,

14   quote, malleable youths ensnared by sly recruiting tactics.

15   When Abdullahi Yusuf was arrested, he in a relatively short time

16   expressed remorse, complete remorse, and then at the trials of

17   his friends and co-defendants, he testified.  In Judge Davis's

18   words, he provided extraordinary assistance such that Judge

19   Davis pointed out the United States Attorney himself, Andy

20   Luger, came to Yusuf's sentencing hearing and talked about that

21   extraordinary assistance.

22       I go through those facts because the juxtaposition with our

23   case is stark.  Mr. Van Haften is now a 36-year-old.  He has a

24   felony record.  He served some prison time, on supervision, on

25   probation, state probation that didn't work very well.  There's

1    nothing in the record to show that he was a malleable youth

2    ensnared by sly recruiting tactics.  In fact, it's quite clear

3    that he chose his own path.  He chose it alone.  He chose it for

4    all the reasons that we've already -- I've already mentioned.

5        He spoke; then he acted.  Unlike Abdullahi Yusuf and the

6    co-defendants, who didn't get out of this country, were stopped

7    at the airport like so many are, Mr. Van Haften obviously

8    traveled to Turkey, and then again, unlike Yusuf, he assisted

9    another individual, Leon Davis.  There's not any special --

10   other than pleading guilty, no real signs of remorse.  We see no

11   cooperation.  Apparently and perhaps still angry at the United

12   States and still isolated.  In fact, in the words from the

13   psychologist, the defense psychologist, he indicated in his

14   assessment if Mr. Van Haften were to travel to Syria and join

15   the terrorists even now, it's very likely he would become

16   involved in violence.  So there's really no comparison except to

17   show that in a totally different case with a totally different

18   defendant, Judge Davis took a different approach.  I would point

19   out that Judge Davis also sentenced several co-defendants to

20   very, very long sentences, people in different situations, up to

21   30 years, as I recall.

22       I think, and I always think it's not a real useful project,

23   but if one is to draw any comparison cases that would help this

24   court, the better comparison would be to the person whose name

25   is absent really from the defense sentencing arguments and the

1    memorandum at least.  That would be Mr. Van Haften's

2    co-conspirator, Leon Davis.  Leon Davis is 36.  Angry man,

3    isolated, wanted to travel to go to ISIL-controlled territory.

4    Never got out of the United States, was arrested in the airport

5    in Atlanta.  He pleaded guilty, and he received a 15-year

6    sentence.  There are differences between these two defendants as

7    well, but if one is going to draw any comparison cases, I would

8    suggest that is one.

9        So in conclusion, I just want to return to where I started.

10   We believe that the 15-year sentence is warranted under 3553 and

11   the factors, as we set out in the memo, calling on the Court to

12   look at who a defendant is, what he did, and the goals of

13   sentencing.  Mr. Van Haften, by his own submissions in the

14   memorandum, is -- seems to be clearly an angry loner who planned

15   to fight and kill Americans and their allies and then acted on

16   that plan.  He assisted another to join the fight.  I don't

17   believe it's overstating it, so I'll state it again:  His views

18   strike us as exactly those of home-grown, violent extremists.

19   We believe the 15-year sentence not only reflects the

20   seriousness of the offense but is just punishment for the

21   offense.  Thank you.

22           THE COURT:  All right.  Let me just follow-up with a

23   couple questions, if you don't mind.  You can sit down if you'd

24   like.  Suit yourself.

25           MR. VAUDREUIL:  Thanks.

1    THE COURT:  A lot of what you say makes a very

2    compelling showing that Mr. Van Haften is, indeed, guilty of

3    exactly what he's charged with and that it is terrorism in the

4    sense that I've already addressed in my decision on the

5    terrorism enhancement, but I still have to make a decision about

6    what sentence best serves the needs of sentencing, and I have to

7    do it all viewed through my legal instruction that I have to

8    impose a sentence that is sufficient but not greater than what

9    is necessary to serve the purposes of sentencing.

10    Your argument here to me today really focused on protection

11    of the public, and so I want to talk about that for just a

12    minute.  Sooner or later -- Mr. Van Haften, given the charge

13    here, has a statutory minimum -- or maximum of 15 years.  Sooner

14    or later Mr. Van Haften is going to come out of prison, and so

15    what then?  Will he be not dangerous after 15 years?

16    MR. VAUDREUIL:  That is our hope.  As you can even tell

17    from some of the Minnesota materials, and I believe it's being

18    used as some conditions of supervised release down in some of

19    the Chicago cases, there is a significant growth in trying to

20    essentially reorient people who have become extremist and become

21    radicalized.  As you can see from the *Yusuf* case with the young

22    man that everybody believed has disavowed those beliefs, they

23    felt they kind of made quite a bit of that distance.  One of the

24    other defendants Judge Davis gave, I think, a three -- close to

25    a three-year sentence.  They felt he wasn't quite there.

1    So in answer to the Court's question, I'm hopeful that

2    through Bureau of Prisons' programs specifically directed at

3    this type of mental mind -- this mindset, I should say, that Mr.

4    Van Haften will change his thinking.  I don't know other than to

5    hope for that, I guess -- I can't predict that -- that he will

6    perhaps continue to practice his faith, the faith he says he's

7    adopted.

8        In all of my connections, and I was with the imam from one

9    of the Madison masjids yesterday, Islam is a religion of peace,

10   and people who actually practice Islam are peaceful.  People who

11   say they're Muslims and subscribe to violence, in the words of

12   all the Muslims I know, they simply are not Muslims.  My hope is

13   that like so many people -- or some people at least who are

14   incarcerated, that he truly does begin to understand his faith,

15   and if that is helpful to him and that is the way he moves

16   forward and becomes a true believer in what I believe is a

17   peaceful -- a religion of peace, then perhaps we can have some

18   confidence that this would be solved as time goes on.  Now, I

19   suppose one might ask can that be done in four years, three

20   years, two years, five years --

21       THE COURT:  You're anticipating my follow-up.  Again,

22   you're really focusing on protection, which I'm going to guess

23   there's sort of a consensus that that is, if not the paramount

24   goal of this particular sentencing, it's at least among the top

25   two concerns, but I wonder if there really is some hope that

1    there's some kind of programming or the incarceration experience

2    itself will help Mr. Van Haften reorient his thinking, that it

3    wouldn't take 15 years.

4         MR. VAUDREUIL:  I don't know the answer to that, of

5    course, and I am -- the Court is correctly assessing that I'm

6    trying to balance that sort of goal with the goal of he's not 18

7    years old.  He's 36 years old, and he apparently is an angry,

8    isolated man, and we need to make sure that nothing happens,

9    nobody is hurt.  So in terms of making that balance, it's

10   probably pretty obvious the United States has opted for

11   emphasizing more in our view of the case the protection of the

12   public view.

13        That doesn't mean we're not hopeful.  We are not --

14   certainly not uncaring in this case, although it may seem like

15   that at some level.  I hope Mr. Van Haften gets his head in

16   order, but he is 36, and as is set out in great detail in the

17   sentencing memorandum, the defense sentencing memorandum, this

18   has been a long time coming, a long buildup of what led him to

19   this moment in his life, and I am not -- my feeling is that it

20   will take a long time to unwind that.

21        THE COURT:  Let me ask you another follow-up.  I guess

22   you cited the -- I think it's Dr. Spierer's analysis in response

23   to Mr. Bugni's question about whether Mr. Van Haften was likely

24   to pose a danger in the future.  And his answer was, more or

25   less, look, Mr. Van Haften wanted to go to Syria and fight with

1    ISIS, and if he's out of the country and could accomplish that,

2    yeah, he'd probably fight with ISIS, but if he stays in the

3    United States, that's just not his goal, to be a domestic

4    terrorist.  He had a fantasy of going and joining ISIS and

5    fighting in the Middle East, but he's never really done anything

6    that would indicate that he's going to do an act of terrorism

7    here in the United States.  Here he's just kind of an angry

8    internet troll.  I mean, if I look at it, I really don't see any

9    indication that there's any plotting to do the kinds of things

10   that we expect from domestic terrorists.  He's never said he's

11   going to do anything like that.

12          MR. VAUDREUIL:  That's correct.

13          THE COURT:  Did he have some specialized kind of vision

14   of what he wants to do with regard to his commitment to ISIS

15   that would suggest that he really isn't going to do anything

16   here?  If we keep him here in the United States, he's not as

17   dangerous as he might otherwise seem?

18          MR. VAUDREUIL:  Your Honor, that's certainly a correct

19   reading of what Dr. Spierer says.  His history and the fact that

20   he's never attempted violence as a lone wolf suggest, of course

21   don't guarantee, but suggest that he wouldn't do so in the

22   future, and Mr. Bugni, I believe, in his memorandum correctly

23   points out -- and I'm not making the argument -- that, well, you

24   never know.  You know, a lot of people do.  So that's not the

25   government's position.  Everything in this case is a man, as you

1    point out, whose goal was to fight in Syria essentially with

2    ISIL and not to go to Fort Hood or other places and commit

3    horrible acts of terrorism and extremism in this country.  So I

4    don't deny that.

5         However, the reason I quoted from Dr. Spierer's answer, his

6    email answer, it suggests he wouldn't do so in the future.  What

7    I'm suggesting is that the -- it is difficult to predict what an

8    angry loner, isolated person will do if he remains like that,

9    and I would hope that we would solve that problem in terms of

10   protection by a lengthy period of incarceration.

11        THE COURT:  All right.  One last question before I

12   pivot over to Mr. Bugni.  Mr. Van Haften had a rough start in

13   life, and it included something that has concerned me all along,

14   and that is that he had a brain injury when he was 12.  And so

15   usually if I look at the background of a person and I find that

16   they have a history that might explain their inability to make

17   normal, pro-social decisions throughout their life, it doesn't

18   relieve them of responsibility, but I do recognize that it might

19   have a mitigating effect as I consider their culpability.

20        And, again, I'm not suggesting that a defendant should be

21   relieved of all responsibility, but when I look at what they did

22   and how responsible they are for it, when I have somebody who

23   has a brain injury when he's 12 that put him in a coma for

24   weeks, I got to think there's a background here and that his

25   mental health may not entirely be his entire fault.  So that,

1       again, it doesn't relieve him of responsibility, but it's a

2       mitigating effect when I'm looking at what an appropriate

3       punishment is.  You don't seem to be particularly open to that,

4       but I expect Mr. Bugni is going to press that issue pretty

5       significantly.

6            MR. VAUDREUIL:  I suspect that's true, Your Honor.  If

7       Mr. Van Haften was here like some of the defendants in

8       Minnesota, as a 22-year-old and we were talking about an injury

9       and a relatively short period of time, I would see it.  I think

10      we would see it as perhaps something that would warrant much

11      more discussion.  That isn't the way we see it, as the Court

12      correctly points out.

13         It's been 24 years, as is set out in detail.  There's been

14      opportunities.  I mean, certainly he's had mental health people

15      approach him.  He's been incarcerated in the Wisconsin prison

16      system, and the anger that comes out of his conviction and his

17      sex register requirement, and Mr. Bugni acknowledges this, is

18      not atypical for people who have to register as sex offenders.

19      It does not seem to me, to us, in any way to be linked -- an

20      anger that's linked to his brain injury.  When he wants to

21      strike back against this country, when he wants to leave because

22      he cannot stand to have to go from state to state and register

23      as the law requires him, I don't see any way that one says,

24      well, that's atypical; that's just related to this injury that

25      he had.

1    Over that long period of time, the anger that led him to

2    these acts and really seemed to be a very big portion of his

3    thinking about why he wanted to strike back against this country

4    and to join ISIL just doesn't seem to be connected to the brain

5    injury.  Had there been no conviction and suddenly there's this

6    angry person -- he was angry from that moment; he's angry ever

7    since -- okay.  But he has this injury.  He's convicted when

8    he's 18, a fact that he continues to -- obviously had to admit

9    because it was statutory but continues to deny any real criminal

10   conduct, completely inconsistent with the victim's story of

11   nonconsensual sex.  So he has that moment six years later that

12   leads to a conviction that leads to time in prison, probation.

13   He's revoked because he doesn't do well on supervision, and then

14   just the anger builds, and I just -- I just, quite frankly,

15   don't see the connection between that anger and an injury as a

16   very young boy.

17        THE COURT:  Thank you, Mr. Vaudreuil.  Mr. Bugni.

18        MR. BUGNI:  Your Honor, Dr. Spierer is here.  I imagine

19   the Court has questions, and I thought I'd call him to give a

20   little bit, but I know that you're going to have other questions

21   as well.  Dr. Spierer.

22   Judge, do you want to swear him?

23        THE COURT:  Go ahead.

24        **MICHAEL SPIERER, DEFENDANT'S WITNESS, SWORN,**

25                          <u>DIRECT EXAMINATION</u>

1    BY MR. BUGNI:

2    Q    Dr. Spierer, how long have you been practicing?

3    A    As a psychologist?

4    Q    Yes.

5    A    About 40 years.

6    Q    How many times have you testified in court?

7    A    I have probably testified several hundred times in courts.

8    Q    Including federal court?

9    A    A few times in federal court, yes.

10   Q    How much time did you spend with Mr. Van Haften?

11   A    We met on two occasions for a total of just under six

12   hours.

13   Q    Okay.  And did you review anything else in this case?

14   A    I did.  I did.

15   Q    Could you tell the Judge what you reviewed?

16   A    I reviewed the presentence investigation report.  I

17   reviewed the report of Dr. William Merrick, who had been

18   retained to conduct a neuropsychological evaluation.  I reviewed

19   the memorandum that you prepared regarding the enhancement

20   argument.  I looked at Social Security documents, foster care

21   records, records -- psychiatric records from the Department of

22   Corrections, and I think that covers it.

23   Q    Did you do any testing with Mr. Van Haften?

24   A    I did.  I administered two psychological tests to him.

25   Q    Was there any evidence he was malingering?

1    A    On the testing there was not.

2    Q    All right.  Now, you've made certain conclusions in your

3    report.  Mr. Vaudreuil has referenced them.  I referenced them

4    in the sentencing memo.  How did you come to understand the

5    behavior that led to Mr. Van Haften's crime?

6    A    My notion, Mr. Bugni, of what happened is that Mr. Van

7    Haften grew up in a family where he was treated poorly, both

8    physically and emotionally.  I detail this in my report, but he

9    was physically and emotionally abused by his stepfather.  At one

10   point his mother gave him and his two half-siblings up under a

11   CHIPS petition because she felt she couldn't handle them.  A

12   great deal of what happened in his upbringing I think affected

13   the way he came to see himself and the way he came to relate to

14   people with whom he came in contact.

15        Over his early years, he had relatively few friends.  He had

16   relatively few contacts with people outside the family.  I

17   quizzed him on both -- occasions of both our meetings about

18   friendships that he had made and retained, and there were,

19   indeed, very few.  He could name a couple of people in his life

20   who he had maintained friendships with, and I came to view this

21   as a kind of isolation that developed for him, isolation not

22   just from family members, but from potential friends.  And he

23   was very much alone, and what happened when he was convicted of

24   sexual assault -- and I parallel what Mr. Vaudreuil said

25   earlier -- what Mr. Van Haften told me was that this was

1    consensual, and he acknowledged, he, Mr. Van Haften,

2    acknowledged that the testimony of the young woman with whom he

3    was involved said that he had forced her to do this.  It

4    indicates he was convicted of second-degree sexual assault and

5    placed on the sex offender registry for life.

6         The impact that's had on him is -- incalculable is probably

7    too strong, but it's been such a strong effect that it's colored

8    the way he has seen relationships, jobs, connections with people

9    in his family.  He's seen no way to make a life for himself.  He

10   has found that when people learn that he's listed in the

11   registry, either they shun him or they make fun of him or they

12   bully him.  Employers won't have anything to do with him, and I

13   think he's taken that notion, and he has tried to find a way to

14   make a life for himself that allows him to work outside the

15   boundaries imposed by that.

16        I've looked at his history over the time since his -- well,

17   since childhood.  He has, with the exception of a conviction

18   that came before the sexual assault conviction, only one violent

19   episode in which he was involved.  He hit another kid in the

20   head with a toy gun.  It was meant to look like a gun.  It was

21   not a real gun.  But in the years subsequent to 1999, I could

22   find nothing either in the presentence investigation or any

23   other materials that I looked through that indicated that he'd

24   committed any violent acts.

25        So I came to view this as an effort on his part to try to

1    find a way, and I say this -- I'm talking about his involvement

2    with terrorist groups -- let me leave that for a moment, but I

3    think what he did in his life was try to find a way to find a

4    place for himself because he couldn't be accepted in the normal

5    way that young men his age were.  That failed.  That really

6    didn't work very well.  When he got to prison in 2000, he almost

7    immediately declared that he had taken up Islam and converted,

8    and it's unclear to me exactly how that process evolved or what

9    he did that took him in that direction, but it's clear from the

10   record and from what he said that that's what happened.  He has

11   maintained a connection with Islam over the last I think it's 17

12   or 18 years.  I think what it has provided for him is a life

13   path.

14        It's struck me that he -- even though he is charged with --

15   he's acknowledged that he made the statements that he made

16   publicly over Facebook and in other social media, that he's

17   never acted in a violent way.  He's never done anything as a, if

18   you will, a lone wolf in the United States.  He's never taken

19   any action to try to harm anyone.  I think in the email I shared

20   with you that Mr. Vaudreuil referenced, I said that if he were

21   overseas, if he were in Syria, for example, I think the

22   likelihood, the probability, that he would do something violent

23   would increase significantly because there he would be with

24   people who were of like mind, if you will, who might have

25   resources that he didn't have, and there I would be concerned

1     about him.  I'm much less concerned in terms of whether he does

2     anything violent if he remains in the United States, and my

3     thinking is based on the notion that the best predictors of

4     future behavior are past behavior.

5          Now, as a Muslim since 1999 and out of prison since 2004,

6     he's had 13 years to act, if you will, and there's nothing in

7     the record, nothing I could elicit from him, that indicated to

8     me that he had done anything like that.  So I think the

9     probability of him acting out violently in the United States is

10    low.

11    Q    What do you make of -- you've read Mr. Van Haften's posts,

12    some of them very vitriol -- vitriolic, some of them very

13    violent, but also many of them telling exactly what he's doing:

14    "I'm going to Syria.  I am trying to get into Syria.  I am doing

15    this.  I am pledging allegiance to ISIS or ISIL."  What do you

16    make of that?

17    A    I think of it as a way of him saying to people who might

18    read these posts that he's found a way in life, he's found a

19    path for himself in life and that this is it, and he has really

20    exercised poor judgment in determining how those statements

21    might be read by people other than those he might have been

22    trying to influence.  But I think that's really a statement that

23    says I finally figured out what to do, and it empowers me, and

24    I'm going to go do that.

25    Q    Is it more or less consistent with somebody who is trying

1   to be covert, surreptitiously cross in and join ISIL, to

2   announce that, hey, this is what I'm doing and this is what I

3   am?

4   A    It's hardly covert to put your name on a piece of paper and

5   post it in social media.  To do something like that, you would

6   assume, and I think he assumed, that others would look at it,

7   which I think is the reason why he put that there.  Would he

8   have suspected that the U.S. government would read those?

9   Possibly.  I don't know.

10  Q    And you've talked about bad judgment, and we all agree with

11  many that that's here.  What impact would the brain injury -- I

12  know Dr. Merrick said there's lingering effects of it.  We don't

13  really know.  There's the hand tremor.  There's other aspects of

14  it.  Lifelong friends have said he was never the same after

15  that.  How would the brain injury affect his judgment?

16  A    I'm not sure that I can tell you how the brain injury would

17  affect his judgment.  What I would suggest may be more relevant

18  is how the brain injury might affect his decisionmaking.  That

19  is, people with certain kinds of brain injuries, and Dr. Merrick

20  refers to this, can be more impulsive, and if you do things

21  impulsively in part because you're biologically, if you will,

22  unable to control that, that's a problem.  I have not -- I do

23  not view -- the neuropsychological aspect is not my area of

24  expertise, but my reading of Dr. Merrick's report suggested that

25  he didn't think this was a major piece of this though the event

1   and the damage clearly had an effect on Mr. Van Haften and his

2   life.

3   Q    You've talked about his ability to be monitored.  Can he be

4   monitored?  Can he cooperate with the rules and the structures

5   that we place on him with supervision and would that reduce his

6   risk?  Sorry, go ahead.

7   A    Let me start with the first.  I think he can be monitored.

8   Again, I hearken back to the years between --

9         THE COURT:  When you say he can be monitored -- and I

10  have read your report, so we can be succinct.  I don't need to

11  have the whole thing recapitulated to me.  But when you say he

12  can be monitored, I don't know what you mean by that.  Like,

13  obviously anybody can be monitored.  We just watch him.  It's

14  really more a question -- the question that matters is how does

15  he respond to it.

16        THE WITNESS:  Well, Your Honor, if I look at what

17  he's -- he hasn't had a lot of therapy, hasn't had a lot of

18  treatment contact in a number of years.  If he were monitored,

19  for example, with an electronic bracelet so that people knew

20  where he was, if he were meeting with a probation agent

21  regularly who could monitor his activities, if he had a job, if

22  he was in psychotherapy -- he has a diagnosis.  One of the

23  diagnoses is bipolar disorder.  He's not medicated for that.  If

24  he were medicated for that, he'd have at least five different

25  points of observation, including probation -- a probation agent

1    who could look at his behavior, look for changes in his

2    behavior, and have a way of judging whether there's some

3    increased likelihood of him acting out in some way that would be

4    either illegal or prohibited by his -- by the terms of his

5    probation.

6              THE COURT:  Okay.

7              MR. BUGNI:  I have no other questions unless the Court

8    does.

9              THE COURT:  I'll give Mr. Vaudreuil a chance.  Maybe

10   he'll bring out whatever concerns I have.  I'll probably have a

11   couple follow-ups.  Go ahead.

12             MR. VAUDREUIL:  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. VAUDREUIL:

15   Q    Let's start with the last point, Dr. Spierer, regarding his

16   ability -- your assessment of the defendant's ability to be

17   supervised, if you will, and if he could benefit from that.

18   You've read a lot of his background.  You know that he's been on

19   supervision before, correct?

20   A    Yes.

21   Q    And you know that he failed, correct?

22   A    I do.

23   Q    And was revoked and sent back to prison?

24   A    I do.

25   Q    And you'd agree that, frankly, throughout the presentence

1    report and the materials we have, that there's really never any

2    indication that Mr. Van Haften has been successful on that sort

3    of supervision.

4    A    Well, to go back to a point you made earlier, he was 19

5    years old at the time.  That's when the probation was revoked,

6    if I recall, and that's when he went to prison.  I don't think

7    he's -- I don't remember whether he has had any probation

8    revocations since that time.  I do remember that any that he's

9    had would not have been related to violence because I don't

10   believe there are any other violent acts that he was charged

11   with.

12   Q    And you indicated -- I'm just kind of going around my notes

13   here, hodgepodge here.

14   A    It's okay.

15   Q    When you talked about what you had assessed, where you

16   believe that Islam had given him sort of a life path, are you

17   aware that he had numerous and frequent arguments with Muslims

18   in the Madison area and that they, in fact, told him they wanted

19   nothing to do with him, that he did not espouse their faith?

20   A    I was not aware of that.

21   Q    Now, you agreed that, and you said that in the email that

22   we've talked about here, that there is a possibility you believe

23   that he would be violent if he was out of the country I think

24   you said with people of like mind and with resources, correct?

25   A    Correct.

1    Q    And I presume you'd agree that there are people in the

2    United States who are angry and disaffected and would like to do

3    violent acts in this country?

4    A    I would agree.

5    Q    And, sadly, some of them have the resources to do so,

6    correct?

7    A    Yes.

8    Q    So would you have any certainty that if Mr. Van Haften were

9    to link up with people of like mind with resources in this

10   country that he would not join in that -- join them in that

11   path?

12   A    I think it -- if he were to hook up with people as you

13   describe, I think the probability that he might do something

14   violent would be increased.

15   Q    And in terms of Mr. Bugni's questions to you about his

16   postings and being sort of visible and all that, are you aware

17   that much of what he posted that -- is now public because we've

18   prosecuted this case, but much of what he posted was posted on

19   extremely private social media communications, networks, if you

20   will?

21   A    I was not aware of that.  I was aware that he had published

22   on Facebook and other relatively common social media, but I

23   wasn't aware of what you asked.

24   Q    And assuming what I have said is true, and it is, would it

25   change your assessment of this sort of openness, if you will, if

1    you were to understand that many of these communications that

2    are in our materials were posted on these private social media

3    communication networks?

4    A    I don't know that it would change my interpretation of why

5    he did this or what effect they might have.  I'm more moved by

6    your statement that some of these remain on private networks.

7    Q    Now, with the brain injury when he was 12 -- I don't ask

8    this in any sign of disrespect -- you're not a neurosurgeon,

9    right?

10   A    Nor a neuropsychologist.

11   Q    And I know you assessed that he doesn't have any psychosis

12   or that sort of mental disease.  I think you said that in one of

13   your reports.

14   A    He does not display symptoms of psychosis now, but I would

15   point to my report where other evaluators who also have

16   diagnosed him with bipolar disorder have found him to present

17   with paranoid and psychotic symptoms, so at some points in time

18   he may well appear that way.

19   Q    And you indicated some of the records from the Department

20   of Corrections indicated I believe October 8, 2001, he had

21   become isolated, intolerant, arrogant, indicated that he stated

22   in 2002 he must spend his life alone so that he will not hurt

23   anyone?

24   A    Is that in my report?

25   Q    Yes, sir.

1    A    Then I must have seen that.

2    Q    Now, you indicated -- and just a couple more questions --

3    that the main driver, and I believe you said this in the email

4    as well to Mr. Bugni, is his requirement that he register as a

5    sex offender, correct?

6    A    Yes.  I think it's broader than that, but I think that's

7    what I said in the email.

8    Q    Specifically what you said, "His desire to find a life

9    outside the United States where he believes he would be free of

10   the albatross of the sex offender registry is one of the

11   drivers" -- I'm sorry -- "one of the drivers that has made him

12   want to leave the country.  His desire to find an identity among

13   members of ISIL is another."

14   A    Yes.

15   Q    Now, this anger at being -- at what you refer to as the

16   albatross of the sex offender registry, ask a couple questions

17   about that.  In your practice you have, I presume, on occasion

18   dealt with sex offenders and done some analysis of them and that

19   sort of thing?

20   A    I have.

21   Q    And would I be correct in saying that this sort of anger at

22   the sex offender registration requirement is not atypical for

23   those folks?

24   A    You would be correct.

25   Q    And there's nothing that you would see, I take it, that

1    would indicate that that anger that is a driver of his -- some

2    of his reason to leave the country, that that anger is connected

3    to this brain injury, this accident when he was 12?

4    A    I don't see a connection between those two.

5            MR. VAUDREUIL:  Okay.  Thank you.  No other questions,

6    Your Honor.

7            THE COURT:  Dr. Spierer, just a couple of questions.

8    Would you just tell me a little bit more about your background.

9    I know you've got 40 years of practice.  I gather you must deal

10   with forensic issues fairly regularly if you've testified in

11   court that much, but I'm not sure I have a really good picture

12   of what you do.

13           THE WITNESS:  Sure.  About four years ago, Your Honor,

14   I retired from my therapy practice and have exclusively done

15   forensic practice.  I began doing forensic work in about 1982,

16   and I have worked with both the State Public Defender's Office,

17   private attorneys.  I consult with the Madison Police

18   Department, the Dane County Sheriff's Department on issues

19   related to officer-involved shootings.  I have done competency

20   evaluations, NGI evaluations, personal injury evaluations

21   probably is the bulk of my practice certainly for the last four

22   years, a substantial part of my practice for the last

23   approximately 30 years.

24           THE COURT:  Okay.  And then is there training,

25   certification?  How do you get into -- for example, you're

 1       dealing with competency evaluations, NGI evaluations.  Is that a

 2       particular subspecialty within the field of psychology?

 3                   THE WITNESS:  It's a good question.  There are

 4       subspecialties in both areas, both those areas in psychology.

 5       I'm old enough that there were no subspecialties in those areas

 6       when I was trained, so my training has come through continuing

 7       education, through work with colleagues, but I don't have the

 8       degree that would allow me to describe myself as a forensic

 9       psychologist, for example, or certification.  So what it says in

10       my work is that I practice forensic psychology, which I'm told

11       is ethical and legitimate, but that's where the background comes

12       from.

13                   THE COURT:  Okay.  And so I gather in this district --

14       now, let me just find out and make sure I'm not making a

15       mistaken assumption.  You live in Madison?

16                   THE WITNESS:  I do.

17                   THE COURT:  And your practice is in Madison?

18                   THE WITNESS:  It is.

19                   THE COURT:  Do you travel around the world or around

20       the country doing this work or is it all here?

21                   THE WITNESS:  It's not all in Madison.  Almost all of

22       it has been in Wisconsin.

23                   THE COURT:  Okay.  Now, in this district sex offenders

24       are pretty common.  We get a lot of those, so I gather your

25       practice probably has a lot of sex offenders that you've looked

1    at.

2            THE WITNESS:  I have seen a number of sex offenders.

3    Mostly I have seen them as part of a treatment process,

4    occasionally as part of an evaluation process.

5            THE COURT:  Okay.  I'm drilling down really to this

6    case because this happens to involve somebody who has a sex

7    offense conviction, and that plays a role in his world view, but

8    this case is a terrorism case, and we're dealing with somebody

9    who has been convicted, because of his plea, of committing an

10   act of terrorism.

11           THE WITNESS:  Yes.

12           THE COURT:  And so tell me about your experience with

13   dealing with people who have become radicalized or pledge

14   allegiance to ISIS or kind of express themselves in the way that

15   Mr. Van Haften has.

16           THE WITNESS:  I don't think I have ever seen anyone who

17   has the same history or a similar history to Mr. Van Haften or

18   who has been charged with a crime like this.  I have seen

19   individuals who have been charged with homicide, people who have

20   been charged with child abuse.  I have seen people about whom I

21   have been asked to make predictions about future behavior, but I

22   don't think that I have seen anybody before who has been charged

23   with this crime.

24           THE COURT:  I mean, this must be a general stock in

25   trade for people in your field that are in Minneapolis.  There's

1    a lot of terrorism convictions up there.  The judge said that --

2    in the *Yusuf* case that Mr. Vaudreuil was talking about, that

3    judge had a lot of experience with terrorism cases.  I'm

4    guessing -- I haven't, and I'm guessing you haven't either.

5            THE WITNESS:  That's correct.

6            THE COURT:  Okay.  All right.  Thanks.  Any follow-up?

7            MR. BUGNI:  A couple.

8                    REDIRECT EXAMINATION

9    BY MR. BUGNI:

10   Q    Back to Mr. Vaudreuil's questions.  Among the things that

11   you looked at were -- and you based your opinion upon his public

12   statements was the PSR, correct?

13   A    Yes.

14   Q    Do you have it in front of you?

15   A    I don't, but I think I have it in my file.  I have it.

16   Q    Could you turn to paragraph 33.  It's the middle of page 8.

17   A    I have it.

18   Q    Could you read the first sentence of paragraph 33 and then

19   the first sentence of paragraph 34.

20   A    "On October 1st, 2014, the agent again viewed the

21   defendant's publicly available Facebook page."

22   Q    And what about paragraph 33?

23   A    "On October 21, 2014, the FBI received authority to execute

24   a federal search warrant on the defendant's Facebook page."

25   Q    Sorry.  You're working on the old one.  We have an updated

1    one.  I'll just --

2    A    I don't have that.

3    Q    That's all right.

4         THE COURT:  I take your point.  I get it.  It's not all

5    secret.

6         MR. BUGNI:  That's exactly it.

7         THE COURT:  There might be some dark web stuff, but a

8    lot of is out in the bright daylight of Facebook.

9    BY MR. BUGNI:

10   Q    And the fact that -- or the allegation that many Muslims

11   have rejected Mr. Van Haften, is that something surprising to

12   you?

13   A    No.

14   Q    Why isn't it surprising to you?

15   A    It's my belief that Islam is a peaceful religion and that

16   the vast, vast majority of people, of Muslims, are peaceful

17   people, and I would think that they would reject not only Mr.

18   Van Haften's position but that of other people who espouse

19   violence in the name of Islam.

20   Q    And given the role that Islam plays in Mr. Van Haften's

21   life, what is that rejection likely to do?

22   A    It adds to the rejection I described earlier, the

23   difficulty he has had forming relationships, and is likely to

24   make the impetus for him to look for another path in life even

25   greater.

1    Q    And we've talked about the five kind of points of contact

2    between medication, checking with probation officer, possible

3    GPS, et cetera.  Does that diminish the likelihood of possibly

4    hooking up with the people who have the resources to commit this

5    kind of attack that Mr. Vaudreuil made allusion to?

6    A    It's hard to know.  I mean, at least in theory if he were

7    monitored in all these different ways, someone would recognize

8    if that happened, particularly a therapist or parole agent,

9    probation agent.

10   Q    And in your two meetings with Mr. Van Haften, was he closed

11   off?  Was he willing to communicate with you?  Was he willing to

12   sit down and talk?

13   A    He was.  Initially he started out with some reticence I

14   think, but as the five or six hours of interview developed, I

15   thought he was pretty open.

16          MR. BUGNI:  All right.  Thank you, Your Honor.  Nothing

17   else.

18          THE COURT:  Mr. Vaudreuil, anything else?

19                      RECROSS-EXAMINATION

20   BY MR. VAUDREUIL:

21   Q    In that five to six hours, did he ever show any remorse?

22          MR. BUGNI:  Towards what?

23          MR. VAUDREUIL:  For this crime.

24          THE WITNESS:  I don't think I can say that he did,

25   Mr. Vaudreuil, nor did I ask him about that.  I mean, it wasn't

1    a question I posed.

2              MR. VAUDREUIL:  Fair enough.  Thanks.

3              MR. BUGNI:  Sorry.  We're going to keep on going back

4    and forth.

5              THE COURT:  Last chance.  Go ahead.  One more.

6              MR. BUGNI:  There is a part in here where there was

7    remorse, but, of course, I didn't tap it.  Your Honor, you

8    already read this, so I'm sure you saw that part about remorse.

9    So no more questions.

10             THE COURT:  Thank you, Dr. Spierer.

11             THE WITNESS:  Thank you.

12        (Witness excused at 1:55 p.m.)

13             THE COURT:  Mr. Bugni, what else you got?

14             MR. BUGNI:  Your Honor, I have given you the best I

15   got.  I have hit you with 38 pages and countless attachments

16   only to be swatted away, and I gave you the best I got as far as

17   a sentencing memo.  What are you struggling with?

18             THE COURT:  Well, what I'm struggling with is that,

19   first of all, let me say you've done a great job of getting me

20   to be able to see Mr. Van Haften in his path through life, and I

21   really appreciate that.  I hope Mr. Van Haften appreciates it

22   because I know you leave it all on the field, and I think you

23   have done a great job.  But here are my lingering concerns is

24   that I think you have made me feel like I have some

25   understanding of Mr. Van Haften's path and how he got to where

1    he was, but here is what I'm left with is, like, I'm sure that

2    everyone who lays down their life to fight for ISIS has a path.

3    Sometimes the paths are the more traditional ones that we think

4    of that come from Minnesota where there's a Somali community,

5    and some subsegment of the community, usually of young men,

6    becomes alienated, and they connect with each other on social

7    media, and they keep it all under wraps, and they end up with a

8    kind of distorted view of Islam and the world that leads them on

9    their path to lay down their lives with ISIS.

10       Mr. Van Haften's path is a little bit different, but -- and

11   he comes to it not so much as part of the Somali community or

12   another ethnic subculture in the United States.  He's done it

13   kind of on his own and in his own sense of isolation has ended

14   up with the kind of deluded -- a world view that's a combination

15   of delusions, the conspiracy theory stuff, his own actual

16   resentments against his treatment in the criminal justice system

17   here in the United States, but he's able to act very, very

18   rationally on the basis of the beliefs that he holds.  Some are

19   deluded, but some aren't, and so this was his path, and this is

20   what he chose to do.

21       The fact that I now understand it doesn't change a lot of

22   what Mr. Vaudreuil says is that he seems to have pledged his

23   commitment to this path and that the path involves a willingness

24   to lay down his life and fight against the United States and

25   kill Americans, and the particular expression of it this time

1    was his trip to Turkey to get to Syria, but if he's frustrated

2    in that because we take his passport, I don't see that there's a

3    fundamental change in the path that he has chosen.  He's not

4    just an internet troll.  It's not just a thought crime.  It's

5    not even just a crime that's based on his expression.  It's

6    really based on his actions, which he was very overt about.

7    Some of the stuff might have been on the darker parts of the

8    web, but he was pretty open about it.

9         But at the same time it seems very rational to me.  Even his

10   resentments are understandable.  His response to them I think is

11   "nuts," I think is the way you put it, but I understand his

12   resentment at the sex offender registry.  I think sometimes the

13   sex offender registry requirement is more broadly applied than

14   it should be, particularly with young offenders.  I understand

15   all that, and so -- but it doesn't really help me feel confident

16   that it's not a set of commitments that portend a very high risk

17   of future violence because it's very, very rational in a way.

18   He has beliefs that are weird and untrue, but he has a lot of

19   things that are just his resentments at what he doesn't like,

20   and this path and a quest for kind of belonging and, like I

21   said, a set of commitments really portends a great risk of

22   future danger.  So that's what I'm stuck with.  I feel like I

23   understand it, but I don't feel like it really alleviates my

24   concern that the public is at danger from Mr. Van Haften.

25        MR. BUGNI:  So I'll address all the points.  I hope I

1    do.  If I don't, just hit them back.

2                THE COURT:  I won't be shy.

3                MR. BUGNI:  So the rationale part, I agree to a certain

4    extent.  There's definitely some parts that, you know, are

5    logical, but there's so much that's not, and I know it's easy to

6    kind of pluck out, well, that's rational and, therefore, we're

7    going to follow it there.  But you think about going to

8    Mr. Vaudreuil -- you know, the first time you meet him and

9    you're like, here you go, check this out.  I'm going to just

10   give it to you and everything in there.  That's not rational.

11   I'm going to go meet with the FBI.  They're here.  I'll tell you

12   exactly what I'm thinking.  I'm going to go -- I'm going to get

13   caught up in Customs.  Guess what?  I'm going to tell you

14   everything I'm thinking.  None of that is rational.

15       None of that is something that's like the plotting, I want

16   to do harm, and I think that's what I was trying to get out in

17   the sentencing memo and all the other submissions is when

18   someone really wants to hurt another human being, they're not

19   telling the United States Attorney.  They're not also telling

20   the FBI.  They're not telling the world on Facebook, and that's

21   part of something different.  That's part of actually the

22   delusional behavior.  Part of why I asked my organization to

23   spend all the money it did on Merrick and Dr. Spierer, rather

24   than going to get somebody who would actually say he's

25   deradicalized or he's not a radical -- and that person, you have

1    to actually go to Germany to get that guy.  There's nobody who

2    has that niche in Minnesota yet.  But that really undergirds all

3    of this, and the more you see it through that, there is this

4    consistent behavior, but it's not rational.

5        Now, in some ways it has to scare you more.  You're not

6    rational; you're going to act.  Well, you said it yourself,

7    supervision, yeah, we can supervise anybody.  We just throw a

8    monitor on you, and we just keep it there, and we're going to

9    make you check in all the time.  That comes down to protection

10   of the public.  Now, where I really came down on this case is I

11   thought about it, and we're really -- what we're doing is we're

12   mad at Mr. Van Haften, and that's very true.  And he's got to

13   get some time for that, and I think five years is enough when it

14   comes to that --

15           THE COURT:  That's just the punishment component.  You

16   think five years does the punishment.

17           MR. BUGNI:  That's it, yeah.  And the reason I thought

18   five years is -- and I think it's actually my first sentencing

19   came before you.  Just five years, when you don't really know,

20   it's just five years seems like, yeah -- you know, is it 48?

21   72?  Five years.  But what we're talking about is protection of

22   the public.  That's it, man.  Like, one day you have to answer

23   for, you know, did you just let this terrorist out.  And Judge

24   Davis, he was comfortable with two of them.  He was comfortable.

25   He was, like, "Look, you guys I think get it.  You guys are

1    deradicalized."  The question is -- for you is, is Mr. Van

2    Haften -- could you do that?

3        And where I draw my analogy, because he's not that typical

4    radical -- I'm all-in -- instead, it's a mixture.  You know,

5    it's a cacophony of different reasons that are playing into it,

6    some rational, some irrational.  You look at like the

7    eco-terrorist, and I don't know if you read the *Christianson*

8    case that we cited in the brief, but that was an eco-terrorism

9    case, actually originated out of this district, and there they

10   make reference to all the other cases that were going on around

11   in the country, and all those people didn't get huge sentences,

12   yet they were doing very terrible crimes.  We're talking about

13   arson.  We're talking about, you know, vandalism to the extreme

14   of burning places, talking about bombings.  We're talking about

15   failed bombings, and I pulled their sentences.  Some of them, a

16   year and a day.  Other people, three years.  One guy, 14 years.

17   One person, 21 years.  But that's sort of what you'd expect with

18   arson.  But a lot of them were all around the five-year mark and

19   some of them less.

20       Why is it that the person who says, you know, "Look, I got

21   to go vegan.  I'm only going to wear Birkenstocks and, by the

22   way, I'm into bombing," so now we're like we got a good risk for

23   you because we can kind of identify with that.  That's the only

24   reason that you can say because they've actually engaged in the

25   violent behavior.  They're the ones who have done it.  Now, the

1    fact that they resemble everybody else we see on State Street,

2    maybe that gives us a little more ease and Mr. Van Haften

3    doesn't, but it says that people who engage in bad behavior, who

4    become extreme in some viewpoint, don't always have to have 15

5    years.  It doesn't always have to be a decade in prison.  We can

6    say, all right, there's other things we can do here, and that's

7    true.  I mean, Christianson, I think she got 18 months.  Other

8    guy got 24.  I can, you know, read off the list.

9         But then I thought a little bit even deeper.  And thinking

10   about the history of terrorism in Madison, it's not very long.

11   Mr. Van Haften actually poses chapter three, and the first one

12   is actually the Sterling Hall bombing, and that was the case

13   back in the '70s --

14             THE COURT:  I remember it well.

15             MR. BUGNI:  Okay.

16             THE COURT:  I was alive then.  I don't know if you

17   were.

18             MR. BUGNI:  Judge, you had me fooled.  But you look at

19   that case, all right, and that's a big case.  I mean, a man is

20   murdered.  People are maimed.  A building is blown up.  Guess

21   what they got?  One guy got 23 years, served 7.  The rest of

22   them, 7 years; they do 3.  Now, we might want to point to Leon

23   Davis and say, "Look, that's the mark, Your Honor," but instead

24   I stand on history.  I stand on the idea that these statements,

25   this kind of behavior that really disrupts us and makes us

1     uncomfortable hasn't just happened with Mr. Van Haften when it

2     comes to ISIS.

3          Violence is violence, and it's all abhorrent, and what they

4     did at the Sterling Hall bombing, what they did there -- now, if

5     we said, all right, you know what?  You can actually be changed.

6     Mr. Fine, you can be changed.  He goes on to become a lawyer.

7     Sorry, let me just get this right.  Mr. Armstrong, he goes on to

8     found Radical Rye, that great sandwich shop over on State Street

9     and the juice cart.  If we can say to those guys, you know what?

10    I don't like that you would actually commit a bombing, a

11    bombing, but we're going to let you out, okay?  That has to give

12    you a little bit of comfort.  You're standing with Judge Doyle.

13    You're standing with Judge Crabb, and you're saying I think that

14    our probation department can do more, and I think that your

15    humanity can change.  I think that we can protect the public

16    with something less than the statutory max.

17         That has to give you comfort, and then it ropes back into

18    it.  What am I trying to do here?  I'm trying to justly punish.

19    I'm trying to come up with an answer that says this is

20    abhorrent, and I'm trying to come up with that answer in the

21    context of what is sufficient but not greater than necessary.

22    And there's not -- there's not a 47.  There's not like a 72.

23    There's just -- man, Josh, that's ISIL.  I mean, that's a bad

24    thing, and we have to condemn it, but we don't need to condemn

25    it beyond five years.  That sends every message that you need to

1    send.  And at the same time --

2            THE COURT:  They're working out the differences between

3    the Sterling Hall bombing and this act.

4            MR. BUGNI:  We'll get a PowerPoint later on today.

5            THE COURT:  I don't think we'll need it.  I think there

6    are huge differences, but, you know, go on.  Point taken.

7            MR. BUGNI:  There are huge differences.  No one died

8    from Mr. Van Haften.  Mr. Van Haften never has a gun in his

9    hand.  Mr. Van Haften never has bomb makings in his apartment.

10   Mr. Van Haften never trains for violence.  Mr. Van Haften never

11   goes paint balling.  Mr. Van Haften never plots with other

12   people to go take an airplane and escape.  Mr. Van Haften tells

13   everybody exactly what he's doing.  So whatever comparisons we

14   might draw with Sterling Hall, they all go towards Mr. Van

15   Haften not needing as much punishment, and that, Your Honor, I

16   submit is why five years is sufficient but not greater than

17   necessary.  I hope that I have addressed your concerns.  I know

18   you're going to --

19           THE COURT:  Let me follow up with another one.  Okay.

20   As I said, sooner or later, whether it's 5 years or 15 years,

21   Mr. Van Haften is going to be out of incarceration, and the

22   suggestion is that supervision is enough to protect the public.

23   I'm not persuaded, and the reason I'm not persuaded is that Mr.

24   Van Haften's anger at the United States was expressed by his

25   trip to Turkey and his attempt to go into Syria where he'd do

1    battle there.  If he's denied that opportunity because we keep

2    him here, which I think we could do, his set of commitments

3    might lead him to do something more lone wolf, more low tech,

4    and I don't know if we could possibly supervise him close enough

5    to stop him from doing that.  If he decides that he's going to

6    do a truck ramming -- you know, granted, something big takes a

7    lot of planning, but there are low-tech things that are

8    dangerous, and he could do that relatively easily, and he could

9    do it in the gaps between the points of contact with the

10   supervising officer.

11        MR. BUGNI:  He could.  Yeah, there is never going to be

12   a guarantee.  There's never a guarantee on anything, and I would

13   be a liar and Dr. Spierer would be a liar if we were just like,

14   oh, no, don't worry about it; he's totally fine.

15        THE COURT:  Dr. Spierer wasn't a liar.  He said he

16   wouldn't know.  I think that's right, but I am concerned that

17   he's able to do things that we just can't possibly supervise

18   enough, and it's in the context here of when I compare it to the

19   case that you cited with the *Yusuf* sentencing, there were really

20   big signs of transformation in that offender, and that's what

21   I'm not seeing here.

22        MR. BUGNI:  I think that's because you have a different

23   kind of offender.  You know, I don't think that -- I don't think

24   that Josh is actually that guy.  Just like Dr. Spierer said, his

25   motivation wasn't I got to go die on the battlefield.  His

1    motivation was I have got to go somewhere and be accepted.  And

2    believe me, we've looked.  The Cistercian monastery, I believe

3    with all of my heart if Josh could go there, if there was a

4    Islamic version of that, you plop him down there where he just

5    gets to work out and pray and somebody is on him, like, did you

6    have 12 lentils or 7?  And you're like, man, I took 12.  All

7    right.  That's terrible.  He needs -- that's what goes towards

8    his psychological makeup.

9         As far as what's going to protect the public, let's see.

10   You know, like, you can't guarantee now and we don't know what

11   he will be like five years from now.  Maybe he connects

12   wonderfully with the probation agent, and it's not like we

13   can't -- you guys can't revoke him for something later on if it

14   became like that.  There's always a violation of supervised

15   release lingering somewhere, and that's always more than enough

16   to send somebody to prison.  Instead, if we're talking about

17   what's sufficient but not greater than necessary, you got to

18   have certainty that, you know, I can't do anything short of let

19   you out.

20        THE COURT:  I don't know if I got to have certainty.  I

21   never have certainty.

22        MR. BUGNI:  Well --

23        THE COURT:  I make reasonable predictions.  I do my

24   best.

25        MR. BUGNI:  But where does it line to?  It lines to the

1    individual.  We never say, like, well, we just can't know;

2    therefore, I'm going to give you the max.  Instead we say, I

3    just can't know; therefore, I give you the minimum.  That's

4    actually what the parsimony clause means.  It's not that like --

5    because we never know.  I never know if many of the people that

6    come before -- I stand next to, if they're really going to

7    change their lives, but we're hopeful, and that's why we give

8    less.

9         You know, if you think about recidivism among drug dealers,

10   there should be no sentence beneath the statutory max because

11   there's always a chance.  But with Josh, you have a chance to

12   deliver a sound message with five years, and you have a chance

13   to say, let's see what supervision can do.  And I agree that

14   there's anger there.  There's a lot of lingering stuff from a

15   lot of different events in his life, but with time things

16   mature.  He hits 40.  You know, and as the doc said, he's never

17   had therapy -- he hasn't had much therapy.  You know, things

18   from when he was 18, 19, I don't think they really count.  You

19   know, that was 17 years ago.  So --

20        THE COURT:  The comparison with the drug dealer is

21   interesting, but it kind of underlines my concern here, which is

22   that if he slips up, it's not a relapse where he slings some

23   dope and some kids get some more meth.  I mean, it's did he --

24   he drives a truck into the side of a building or onto the

25   sidewalk or that he does something really catastrophic.  The

1    stakes are more cataclysmic here if he decides that he can't get

2    over his anger.

3          MR. BUGNI:  True, true, but you're also going to see

4    him for something else.  If that's what the psychologist is

5    telling you -- and hopefully five years from now we have a

6    better understanding of this.  And maybe I did play it wrong.

7    Maybe I shouldn't have hired Spierer, and I should have hired

8    the deradicalization guy from Germany to let you know because

9    that's really -- like, what you're searching for is, you know,

10   like, that certainty, and I don't think that I can provide that,

11   but I do think that we can say the best opportunity to have that

12   is going to be in mental health therapy when he's released and

13   he is monitored, and then you get a chance to see.

14        Now, you have lifetime supervision at your hands.  That

15   means you can revoke him for a long time if there is -- like

16   he's not living up to his side of the agreement, if there isn't

17   that legitimate change, if there are even those small

18   increments.  Probation is bad enough or supervision is bad

19   enough for the guy who is dealing drugs.  I can't imagine what

20   it's going to be like for the guy with the terrorism charge.  So

21   they're going to be on him.  This isn't going to be like we'll

22   see you every couple months.  That should give you comfort to

23   say, all right, you know, I can try this.  I trust our probation

24   department.  I trust Mr. Van Haften.  If he's willing to meet

25   with a psychologist, and he didn't say, look, you know -- I

1    can't even say it in Islam -- but I don't want anything to do

2    with you.  No.  You know, he's communicated with me.  He's

3    communicated with Dr. Spierer.  He has given the indications.

4        Now, in many ways we want the mea culpa, you know, just

5    throwing it down.  That's not going to come.  That really isn't

6    going to come because so much of him is so complex and so many

7    of the different reasons, but we also don't have -- we have very

8    little as far as I want to kill GIs versus I'm afraid of Prince

9    William.  In the grand scheme of things, those statements, they

10    far outnumber it.  And you, Your Honor, can take some comfort

11    that this is complex, and the mental health professionals can do

12    their job, and he can cooperate, and if he's not, then you have

13    the power to revoke, and that's why they give you that

14    supervision.  It's not just three years.  It's the ability to

15    give a much longer term because if we do get it wrong, think of

16    what we've cost.  We've cost Josh his freedom.  You know, that's

17    why Judge Davis is willing to go out on a limb.  He's like,

18    yeah, you know what?  I can accomplish everything I need to

19    accomplish with less.

20        And that was the point of the sentencing memo.  It wasn't

21    just like, hey, Judge, everybody else is doing it.  No, not

22    everybody else is doing it.  But it's to say that it doesn't

23    have to be 15 years.  It can be 5.  It can be 5 with

24    supervision, so, Your Honor, that's what I'd humbly submit

25    should be the right sentence here.

1          THE COURT:  Before I turn to Mr. Van Haften, I'm sure

2      all of that mad notetaking was to some end, so Mr. Vaudreuil.

3          MR. VAUDREUIL:  I have written --

4          THE COURT:  And I'm more interested in hearing your

5      responses to my concerns, you know, and obviously I had a lot of

6      concerns I voiced with Mr. Bugni, but I do really --

7      fundamentally I get it.  You know, they're going to get a stout

8      sentence here for somebody who has committed a really serious

9      crime that if we take him at his word, he's just, you know,

10     committing to hurt America and Americans, so I get that, but I

11     still have to calibrate this to an appropriate level.  And so

12     whether I have to go to the statutory maximum -- again, since

13     we're driven by the concern with protection of the public, I can

14     put him on supervision for the rest of his life, and sooner or

15     later that is going to be what separates us from another

16     terrorist act by Joshua Van Haften is that there's some PO who

17     is keeping an eye on him, and whether I have to tack on another

18     five or ten years to a prison sentence, you know, I don't want

19     to do it just for symbolic purposes because we're, you know --

20     because ISIS and terrorism are involved here.  I want to do

21     what's right for the public and for justice, not just for

22     symbolic reasons.

23         MR. VAUDREUIL:  And I appreciate that, Your Honor, and

24     we aren't making the request for symbolic reasons.  I don't

25     think anybody would disagree that the only way for any certainty

1    would be life in prison, and had he been convicted of this crime

2    and also assisting Leon Davis, he'd be looking at 30 years in

3    the maximum penalty, and the guideline range of 292 to 365 would

4    actually come into play.  We're already talking about an almost

5    ten-year reduction from that guideline range, and that's fully

6    appropriate.  That's the plea agreement.

7        Just a couple of things that I think that -- and I tried to

8    organize my notes from what Mr. Bugni was saying, what I have

9    taken from Dr. Spierer, and from the Court's questions.  There

10   are no signs of transformation.  There is no indication that he

11   can change or wants to change.  I would go back to the fact that

12   it has been 18 years since he was convicted of the sexual

13   assault.  He still denies that that was anything but consensual.

14   He still contends the victim was lying.  He is still angry at a

15   sexual registry.  That's 18 years.

16       And so the idea that he would be out in a couple -- you

17   know, if he gets five years, he's done two and a half.  He's got

18   two and a half more years.  He does 86 percent of that under

19   federal law, and the idea that he would then be out and being

20   supervised by -- well, Rich is going to retire but somebody who

21   follows Mr. Williams, and that they would be able to solve this

22   anger problem and watch him carefully, nothing from his prior

23   conviction and where he stands today I think should give the

24   Court any confidence that that's the case.

25       His motivation to fight against the United States, this

1    anger really seems -- the driver, as Dr. Spierer talked about

2    today and in writing, is this sex registry, not atypical, not

3    linked, in Dr. Spierer's opinion and apparently in mine as well,

4    to his brain injury, and he has carried that with him to the

5    effect that he wants to leave the country, cross the border into

6    a despicable, horribly broken war zone, and kill Americans and

7    their allies.  That's an anger that is unfathomable to us, but I

8    think those are, I think, some of the key bullet points.  No

9    signs of transformation, no indication he wants to change.

10       Just a couple of other remarks, Your Honor.  You asked the

11   questions -- you stated, look, he asked rationally -- he acted

12   rationally, excuse me.  His resentments seem to be

13   understandable.  It is not a thought crime, and I want to make

14   that -- and I said it before, and I'll say it again.  We don't

15   prosecute people in this country for that, but in your words, I

16   believe, "portends a great risk of future danger."

17       And then there was some -- Mr. Bugni was addressing this.

18   You know, he was interviewed.  He talked about what he was

19   doing.  It was rational.  It worked.  He did not become

20   seriously "wait a minute, we got a problem" on the FBI and all

21   of our radar until he had been in Turkey for a couple of weeks.

22   So it did work.  He didn't get stopped at the airport like a

23   huge percentage of the people prosecuted for providing material

24   support.  They get on our radar, we figure this out, and we stop

25   them before they get out of the country.  So it did work.  What

he did was rational, and it achieved what he wanted to achieve.

He got to the Syrian border, and then because he couldn't get in

and so on and so forth, as we all know he didn't make it.  So

that was the second point.  It was rational; it did work.  It

only seems irrational, like so many crimes, when you stand here

today and you go, well, why would he tell the truth?  Why would

you do this?  Why would you do that?  Well, when you turn the

clock back, when he said those things, nothing happened because

he was talking.  He was a talker then.

Two more points.  One -- and I'm just going to briefly

mention it because it goes to my response regarding these

comparison crimes -- *Yusuf* is not a comparable, and Sterling

Hall is most certainly not a comparable.  I was around.  We have

the open case.  We have a fugitive.  We read this file.  It's

ten feet outside of my office in a file room.  It wasn't murder.

It was 3:00 in the morning.  They called the police.  They did

not know Dr. Fassnacht was there doing research.

When Judge Doyle, and I have his sentencing statement and I

keep it close at hand, when he sentenced Karleton Armstrong, he

pointed out how different things were from 1970 and 1974.  We

were leaving Vietnam.  It wasn't 1970.  There wasn't a draft.

And he was sentencing a man who was not the same student radical

that Armstrong, Armstrong, Fine, and Burt had been in 1970.

There is simply no comparison.  There are other facts that make

it noncomparable, but my point isn't -- just to clear up the

1     record.

2          But my point is this is -- if one wanted to look at

3     comparables, and I didn't intend to do this, you would bring in

4     all the people like Leon Davis who have been sentenced to 15

5     years or thereabouts, 12, 13, 14, 15 years, who were stopped at

6     the airports.  Judges across the country have found that

7     significant enough to put people in prison for a long time

8     because, I suspect without knowing, they don't see any signs of

9     hope or transformation at that moment in time.  But I say that

10    not because I want the Court to think of it that way.  I think

11    this is a fool's errand to go down the rabbit hole and try to

12    find these comparables.  When I say a fool's errand, I am not

13    implying the Court is doing that, just to be clear, but I don't

14    think we need to do that --

15          THE COURT:  I agree with you.  You don't have to

16    belabor the point any longer because I never know enough about

17    most of the other cases to really feel that I can compare apples

18    to apples because, as Mr. Bugni would tell me every single time,

19    I have to sentence the offender and not just the crime, and I

20    don't know enough about those individual stories to say, yeah,

21    this guy is a Leon Davis, done.

22          MR. VAUDREUIL:  Absolutely.

23          THE COURT:  So it's all about what we're doing here.

24    Consistency is part of justice, so I'm not totally deaf to

25    comparable sentences.  I think that that is an appropriate

1    component of justice, but we reach a point of diminishing

2    returns where I just don't know enough about that crime and that

3    offender to say, yeah, I got to do that so --

4         MR. VAUDREUIL:  I appreciate that, Your Honor.  The

5    last point I would make in response to Mr. Bugni's argument that

6    Mr. Van Haften is not the typical radical -- he wasn't all-in --

7    he left the country.  He got to Turkey.  He got to the border.

8    He was waiting at the tram stop for Leon Davis.  I simply don't

9    know how much more all-in he could be, and with that I'm done.

10        THE COURT:  All right.  Thank you, Mr. Vaudreuil.  All

11   right.  Now I'm ready to hear from Mr. Van Haften.

12        MR. BUGNI:  Can I give like 45 seconds?

13        THE COURT:  You can have 45 seconds.

14        MR. BUGNI:  I appreciate that, Your Honor, just because

15   I don't want it to weigh into your calculus.  Mr. Vaudreuil's

16   point, he still denies the sexual assault after 18 years.  Well,

17   there could be two reasons for that.  One, he's delusional and

18   he just refuses to accept the facts or maybe it didn't happen

19   that way.  Why do we know it didn't happen that way?  Because of

20   the sentence he got.  You don't rape a girl with that criminal

21   record when you're that young and you get probation.  The judge

22   is, like, don't worry about it.  Sure, it's fine.  That's how

23   you look into a case.  Nobody is walking out of state court with

24   that hell-on-wheels record at 18 years old and they're like, oh,

25   yeah, that's great.  I'm sure you'll be fine with that.  So

1    that's a big indicator.  The fact that he continues to persist

2    in that shouldn't be held against him.  It should be said maybe

3    you did get a raw end of the deal.  Maybe that sophomore and

4    senior conduct really has been something that is hard to grasp.

5             THE COURT:  Look, I take your point, but here is -- the

6    problem is that everybody has something they can be angry about,

7    and we're not here because Mr. Van Haften is angry about the sex

8    offender registry.  We're here because of his response to it.

9             MR. BUGNI:  But that goes to his remorse, and that's

10   the thing is there isn't going to be the mea culpa.  There's not

11   going to be, you know, like it's just, oh, man, here you go.

12   And that's for two reasons.  One is that --

13            THE COURT:  I'm not looking for the mea culpa on the

14   sex offense from when he's 18.

15            MR. BUGNI:  But what you're wanting is for him to say,

16   you know -- I think what everyone really wants is this

17   heartfelt, you know, gosh, I did wrong, and it just won't happen

18   again, and Josh can say it.  You know --

19            THE COURT:  And I'll be honest with you, that's not

20   really what I'm looking for.

21            MR. BUGNI:  Okay.  Tell me what you're looking for.

22   I'll give it to you.

23            THE COURT:  I don't think you can.

24            MR. BUGNI:  All right.

25            THE COURT:  I'm looking for that sign of transformation

1      that was in the case -- the *Yusuf* case that you cited to me.

2              MR. BUGNI:  Sure.

3              THE COURT:  Some indication that all of these things

4      that set Mr. Van Haften on the path that led him to Turkey, that

5      those don't apply anymore.

6              MR. BUGNI:  And that's not going to happen.

7              THE COURT:  I know it.

8              MR. BUGNI:  I mean, partly because --

9              THE COURT:  That's the nub of the problem that I have

10     here because otherwise I'd say, yeah, look at this crime here.

11     Nobody actually got shot.  He didn't even shoot at anybody.

12     Mr. Vaudreuil has a point about the all-in business.  I mean, he

13     went all-in.  It's just that the chips got pushed back to him

14     because he didn't get across the border into Syria.  Otherwise,

15     I have no doubt that he would have gone into Syria and died

16     fighting for ISIS.

17             MR. BUGNI:  Or he leaves.  I mean, part of what I cited

18     to you was they got a ton of people from Europe, especially the

19     Netherlands, who they're like, whoa, this isn't what I signed up

20     for.  This is not what I wanted.  Even in Dr. Spierer's

21     report -- and that's what I was trying to find.  I'm kicking

22     myself for not tabbing it, but there is a moment where Josh says

23     I wouldn't have gone if I would have known what it was, you

24     know, that it was like this, with everything else that's

25     happening.  So, yeah, you know, Yusuf's is very easy.  Gosh, I

1    was wrong -- I was with the wrong guys, and they just tricked me

2    and --

3         THE COURT:  And then he put his money where his mouth

4    is and testified, and I don't see that from Mr. Van Haften.  I

5    wish I did, but I know, it's not there.

6         MR. BUGNI:  If Mr. Vaudreuil would bring some more

7    trials, we'd testify.  But what we really need here and what we

8    have here is an individual, and that transformation is not the

9    only thing that would allow for a five-year sentence.  And

10   that's what my point is, is that, yeah, I would love to give you

11   the gold star and just like, here you go, and you can really

12   trust in it.  I can't give you that, but what I'm saying is what

13   I can offer is his sincerity in sitting down with Dr. Spierer.

14   The fact that nobody has detected he's malingering or just

15   hiding everything.  That he's cooperative and that everything

16   else that went into this crime says this is someone who we can

17   protect the public with with something less than a decade in

18   prison.  It can be five years, and five years would fit that

19   bill because we would have him under supervision.  That's it.  I

20   mean, I can't sell you the Cadillac, but I'm going to give you a

21   great Honda, and that Honda will get you what you need, and

22   that's safety and that's protection and that's from point A to

23   point B, and that should be enough to guarantee that this

24   sentence is five years with a stiff amount of supervised

25   release.

1          THE COURT:  Mr. Van Haften, I'd like to hear from you.

2          THE DEFENDANT:  I beseech the law's protection in what

3     is to proceed and invoke prayers and blessings upon the Prophet

4     Muhammad.

5       I would like to begin by offering thanks to my esteemed

6     counsel and everyone from his office who has worked with me over

7     this past year and 11 months.  When I sat in Turkish immigration

8     center, I believed that when I came back to the United States,

9     that I would be railroaded by the criminal justice system.  I am

10    thankful that was not the case and that Mr. Bugni and his office

11    have diligently represented me.

12       Despite what has been said about me, I also want to thank

13    Mr. Vaudreuil for taking the time and speaking to my mother when

14    I was in Turkey and putting some of her concerns at ease.

15         Finally, I do not agree with all that has been said about me

16    in the filings and today in court, but I hope that everyone

17    could believe that I would never have hurt anyone.  Given the

18    Court's order and the terrorism enhancement, I think that

19    anything else I say would be considered self-serving, but I want

20    to make sure I convey my thanks to Mr. Bugni, to Mr. Vaudreuil,

21    and to let you know that I didn't want to hurt anyone.  I just

22    wanted to be away from the United States, specifically the State

23    of Wisconsin Department of Corrections.  That was all.  Further,

24    that is all I have to say.  Thank you.

25          THE COURT:  All right.  Mr. Van Haften, you don't have

1    to worry that I will take your comments to be self-serving.  So

2    I want you to feel like you can speak freely, and I'm -- I don't

3    hold it against you for wanting to tell me what we have said

4    that's wrong, and I don't want you to feel like you got to hold

5    back because I'm going to think that you're being self-serving.

6    I think, to be honest, the defendant's allocution is supposed to

7    be self-serving.  You're saying this to help yourself, so don't

8    hold back.  Tell me what you want me to know, and if that's all

9    you want to say, that's fine too.  Don't feel that I'm trying to

10   twist your arm into saying something else.

11           THE DEFENDANT:  Yes.  I don't think that, Your Honor.

12   I just -- I'm a deep-thinking, more deliberate person, and I

13   said a lot of things -- I still say a lot of things.  I talk a

14   lot, say a lot of things that I didn't mean to, you know, to

15   facilitate, you know, seeing and, you know, being some part of

16   what I wanted to see happening going on.  You know, I didn't

17   mean everything I said via Facebook and, you know,

18   communications on the internet and to other people.  I discuss

19   things.  I never -- from my understanding I was not pushed out

20   of a masjid or told -- not allowed.  That never happened, not

21   allowed to come or, you know, be around anybody.  There were one

22   or two people that didn't agree with some of the things that I

23   expressed from what I seen happening, but anyhow, like I said, I

24   have said a lot of things, and I didn't mean to take full action

25   in everything that I expressed.

1          THE COURT:  Do you still feel committed to the

2    principles that guide ISIL?

3          THE DEFENDANT:  I do not, sir.  I -- you know --

4    things -- it was declared on June 29th.  I had been, you know,

5    listening and, you know, watching some videos by other Muslims

6    talking about what was going on.  Previously when I was in

7    Egypt, I had heard about, you know, things that were happening

8    there, and I didn't know that it would become what it became.  I

9    was there the first month after it was declared, you know, and I

10   had intentions to, you know, go and be around those people and

11   see what was happening, and so I said things to be accepted, to,

12   you know, gain their acceptance.

13         THE COURT:  But you saw the video of Mr. Foley being

14   beheaded, and you expressed approval of that.  You liked that

15   video.

16         THE DEFENDANT:  Again, this was for their acceptance,

17   to allow me, you know, entrance into their area and, you know,

18   be around those people and see -- for me I wanted to see how the

19   other Muslims were being cared for or, you know, being handled.

20         THE COURT:  All right.  Anything else you want to share

21   with me?

22         THE DEFENDANT:  Not on the top of my head, sir.

23         THE COURT:  All right.  Thank you, Mr. Van Haften.  I'm

24   going to take a brief recess, and I'll come back, and we'll

25   finish up the sentencing.

1          THE CLERK:  Court is in recess.

2      (Recess taken from 2:35 p.m.-2:47 p.m.)

3          THE CLERK:  Please be seated and come to order.

4          THE COURT:  All right.  Thank you all for your

5    patience.  Mr. Van Haften, I'm going to start by talking

6    directly to you because I want my sentence to be a message not

7    just to the public, but also a message to you.

8          One of my big concerns here has been that I had not seen

9    signs of transformation from you.  This isn't like the case that

10   Mr. Bugni cited from Minnesota where somebody came back, and

11   they recanted their position, and they testified against other

12   defendants in terrorism cases.  I don't have that kind of sign

13   of transformation, and I know that all the things that made you

14   angry with the United States are still there.  The isolation

15   that you experienced, that might still be a factor in your life

16   going forward, and so I'm concerned that you're the same person

17   now that you went -- that you were when you went to Turkey.

18         But the difference is now I do have your words to me, and

19   your words mean something to me, and it sounds like you're

20   sincere now, but, of course, I have to measure your words

21   against what you did, and so when I listen to your words now and

22   you're telling me that you really want everybody to believe that

23   you would have never hurt anybody, you never would have followed

24   through on what you said, that is very hard for me to believe.

25   And so I have to look at what you did against what you're

1    telling me now, and I have a hard time really being fully

2    persuaded that you never would have followed through on your

3    pledge to go into Syria.  So that's really what I want to lay on

4    the table first, and I want to say I have heard your allocution.

5    It sounds sincere, and I don't believe that you're a hopeless

6    case, but I have to do what's right for you and for the public

7    in setting a sentence.

8         But I also want to make part of the message that I have for

9    you is you've not been railroaded here.  I think, as you

10   acknowledge, Mr. Bugni, who just as a matter of his ordinary

11   life as a lawyer really gives his all to his clients -- I have

12   seen it time after time after time -- but he gave his all and

13   then some for you in this case, and I think -- I appreciate you

14   recognizing that because he really did go all out for you on

15   this case.

16        I also want you to know that I spent a lot of time on this

17   case, not just because I respect Mr. Bugni and Mr. Vaudreuil and

18   their presentations here, but I took this as a really serious

19   case, and I'm very aware of the potential for this to be the

20   kind of thing in which the public is so outraged because the

21   words "ISIS" and "terrorism" are used in connection with your

22   crime, and I want to assure you that I'm looking to do something

23   that is the right thing to do, not because of the symbolism that

24   it has.  I need to have a sentence that reflects the seriousness

25   of the crime, but I also have to tailor it to you, and I know

1    that Mr. Vaudreuil is not doing this just to grandstand because

2    it's a terrorism case either.  And so I want you to feel like I

3    have been fair to you, that I have heard out your counsel very

4    fully, and I have heard you very fully.  And so I want to tell

5    you that I'm trying very hard to be fair to you and to really

6    tailor this sentence to you and not just to somebody who ended

7    up pledging themselves to ISIS.

8        I understand that your motives here in committing yourself

9    to ISIS were in a significant part because you were looking for

10   some way to find acceptance in some group, and then it resonated

11   with you to some degree because you had pledged yourself to the

12   faith of Islam, and I can understand all that, but what we have

13   to recognize here is that the acceptance you sought was with a

14   community whose fundamental values were not just antagonistic to

15   the United States, but were pledged to battle with the United

16   States and violence against the United States, and one of the

17   things that you saw was the beheading of James Foley and that

18   you expressed appreciation for that.

19       And so I understand your quest for acceptance, I really do,

20   and I even understand your anger at the sex offender treatment

21   that you have, but I can't escape the fact that you sought

22   acceptance from a group that expressed the intent to commit

23   violence and that you so vigorously indicated in your Facebook

24   postings and in your other correspondence that you were

25   committing yourself to that course of action and that you went

1    to Turkey to do it.  So I'm not really persuaded that you

2    wouldn't have gone through with it hadn't you been -- if you

3    hadn't been stopped by external factors.  And you also helped

4    Leon Davis find himself in the same boat.

5        So I have to look at the whole picture here, and really I

6    think it's been pretty clear that the main drivers of the

7    sentence here are punishment for what is a very serious crime

8    and to protect the public from what you might do in the future.

9    Punishment is just not an exact science.  I really -- I'm more

10   or less persuaded that I don't need to sentence you to 15 years

11   just to punish you, but I'm not persuaded by Mr. Bugni's

12   explanation or argument that 5 years is enough either.

13       But really the primary driver of our sentence here is to

14   protect the public.  Sooner or later we're going to have to rely

15   on your supervision to protect the public, and now my comments

16   are not just for you, Mr. Van Haften, but kind of for everybody.

17   Whether it's in 15 years or 10 years or even 5 years, sooner or

18   later we're going to have to have Mr. Van Haften out in the

19   world as a citizen among us, and this is a result in part

20   because of charging decisions that the U.S. Attorney made

21   because they didn't charge this in a way that would allow me to

22   give you a sentence of 30 years or life or any such thing.  So

23   Mr. Vaudreuil has already exercised some discretion here to

24   expose you to a maximum term of 15 years, which means sooner or

25   later you're going to be out, and we're going to have to rely on

1    supervision to protect you from the public.

2         I think you're going to be a challenge potentially to

3    supervise because if you really were committed to violence

4    against the United States or its citizens, you know, you

5    could -- you might be able to do it, but the bottom line is

6    sooner or later you're going to be out on supervision, so the

7    question really comes, and Mr. Vaudreuil really put it kind of

8    nicely, what's enough in terms of the incarceration sentence?

9         I'm going to sentence you to a term of incarceration of ten

10   years, and I really mean to communicate here a couple of things.

11   One, this is a very serious crime that warrants a very serious

12   sentence, and ten years is that.  Five years, especially since

13   you've already served two and a half, means that you're going to

14   be out relatively shortly.  I think we need ten years to develop

15   some confidence that you'll have time to have programming, time

16   for reflection, a substantial punishment so you recognize that

17   we take this very seriously, but I'm also trying to communicate

18   to you that I am not writing you off by just automatically

19   giving you the statutory maximum sentence.

20        I don't know that you're really going to see this as an act

21   of enormous mercy here for you, but I mean to communicate to you

22   something, that the justice system in the United States is not

23   unrelentingly unfair.  It's not thoughtless.  I'm giving you

24   what I think is a thoughtful sentence, and it is not the

25   statutory maximum, and I hope you appreciate that.

1       I don't think your crime was victimless, although you didn't

2   actually shoot anyone or take up arms, but you have to look at

3   what has happened to Mr. Davis with your assistance.  He's

4   serving time in prison.  But I think your expression of intent

5   to harm the United States and its citizens was really very clear

6   and hard to mistake.  I take you at your word today that as you

7   sit here now, you no longer subscribe to those violent views,

8   but I don't know if that's a position that will endure over

9   time.  I am really worried that you might be the kind of person

10  who, in isolation and in kind of a belief system that you've

11  adopted in the past, you might return to that and you might

12  decide that some expression of violence is warranted again.  You

13  expressed it before in your travel to Turkey, but I just have to

14  recognize that there is some substantial risk that you'll become

15  alienated and isolated again and that you'll draw information

16  from sources that have information that's -- that leads you into

17  deciding that violence is appropriate, so I have to protect the

18  public I think with this term of incarceration for ten years.

19      The term of supervision that I will impose will be for the

20  rest of your life.  I'm going to put you on supervision for the

21  rest of your life because I just -- all of the factors that led

22  to your decision to commit this crime to me are going to be

23  permanent features of your life.  You're going to be a sex

24  offender and have to register as such for the rest of your life.

25  You think the United States is anti-Islam.  That is a perception

1    that can endure for a really long time, and so for the

2    protection of the public, I'm imposing a term of supervision

3    that will be for the rest of your life.

4        Now, we haven't talked specifically about the conditions of

5    that supervision.  I didn't really get any objections to those,

6    and so I'm prepared to impose the conditions that are proposed

7    and justified in the presentence report, but let me check with

8    Mr. Bugni and Mr. Vaudreuil if they have any objections or

9    concerns with those conditions, which are Condition No. 1,

10   Condition No. 2, Conditions No. 4 through 9, all of those among

11   the standard conditions, and 12 through 18 of the special

12   conditions.

13       MR. BUGNI:  Judge, I -- maybe everyone will disagree,

14   but I think that 14, 16, 17 are unnecessary, and not just our

15   position about what happened 18 years ago, but the fact that

16   there's been no conduct since then.  I don't think that there

17   should be --

18       THE COURT:  Let me make sure I get those.  That's 14.

19       MR. BUGNI:  14, 16 -- 15 just says you have to comply

20   with the law, so we're fine with that.  So 14, 16, 17.

21       THE COURT:  Mr. Vaudreuil, what's your reaction to

22   those?

23       MR. VAUDREUIL:  Well, I think, Your Honor, 14 is a

24   totally different situation because that requires him to

25   participate in substance abuse treatment.  It has nothing to do

1   with this sex offender status.

2        THE COURT:  We have some history of use of

3   intoxicant -- it's not very serious, but he used marijuana and

4   alcohol.

5        MR. VAUDREUIL:  I think -- and the basis for, as is

6   stated in the appendix, is on basically his self-reported use of

7   drugs.  I think it is one of those conditions that should remain

8   in place because of that, but as we always say, when he gets out

9   of prison, if this is no longer needed, they can approach the

10  Court.

11       THE COURT:  Yeah.

12       MR. VAUDREUIL:  Regarding the -- excuse me, 16, 17, and

13  18, which are essentially -- I know monitoring contact and

14  technology with people under the age of 18 given his sex

15  offender status and, as they point out, his violations of

16  supervision back then without -- with underage girls, I think --

17  again, I think the basis is there.  I think the recommendation

18  is based on facts that really are simply beyond dispute, and I

19  think the probation officer should be given the ability to

20  monitor this sort of activity as well.  So we would join in the

21  recommendation of the probation officer for those three

22  conditions.

23       THE COURT:  All right.  That's -- did you object to 18?

24       MR. BUGNI:  Sorry.  Let me just pull up 18.

25       THE COURT:  18 is the IT restriction.

1          MR. BUGNI:  I think -- I'd be disingenuous.  My whole

2     sentencing memo said 18 would do everything you wanted.

3          THE COURT:  I would overrule it if you were objecting

4     to 18.

5          MR. BUGNI:  I wasn't even going to.

6          THE COURT:  16, 17, and then the substance abuse.  I'm

7     going to overrule the objection as to 14.  I'll leave it there

8     in place.  I don't think that Mr. Van Haften has a really

9     substantial history of substance abuse, but he does have some

10     self-reported substance abuse.  So let's -- I'm going to leave

11     that in for now.  Again, all of these are with the proviso that

12     they can be revisited, which I will make a more explicit

13     statement about that in a minute.

14          I'm more ambivalent about 16 and 17.  I am not going to -- I

15     am going to sustain the objection as to 16 and 17 with the

16     proviso that those be revisited as well if they become

17     appropriate, but I don't think -- you know, we have the burdens

18     of the Sex Offender Registration and Notification Act.  That

19     provides some leeway, it seems to me, on third-party

20     notification, and I think that that provides the supervising

21     officer with some leeway to consider whether further action

22     should be taken with regard to the -- Mr. Van Haften's conduct,

23     but I don't think we've got any indication that there's been any

24     inappropriate sexual attention directed to children since the

25     original offense, and, again, given the fact that the nature of

1    the offense -- and again not whether it's -- the offense is

2    challengeable in any way.  It did involve contact with a minor

3    when Mr. Van Haften was himself 18 years old, so I don't think

4    there's any indication that Mr. Van Haften has an abiding

5    interest in sexual contact with minors, and so I will not impose

6    16 and 17.

7        But, again, all of these conditions are imposed here in

8    anticipation of their application when Mr. Van Haften is

9    released from prison, and, Mr. Van Haften, I'll make this very

10   clear to you:  These conditions are my prediction about what's

11   appropriate for you.  If when you begin your term of supervision

12   these conditions aren't appropriate, if we need to eliminate

13   some, add others, refine any of them, you can make a motion to

14   the Court to do that.  The government can do the same thing and

15   so can the probation office.  So for now I'll start with these.

16       Now, the Seventh Circuit suggests that I should read these

17   into the record unless the reading and justification is waived.

18           MR. BUGNI:  We'll waive.

19           THE COURT:  All right.  So, Mr. Van Haften, I'm not

20   going to read these to you now.  A lot easier for you to look at

21   them in writing and go over them with your counsel as well.

22   I'll make a record again that the conditions that are imposed

23   are conditions 1, 2, 4 -- 1, 2, and 4 through 9.  Those are

24   among the standard conditions of supervision, and then I'm also

25   going to impose special condition 12, 13, 14, 15, and 18.  I

1    will not impose 16 and 17 at the time.  Okay.  So those are the

2    conditions that we will impose.

3         Let me make sure that I cover the remaining formalities of

4    the sentence here.  So, as I said, taking into consideration the

5    nature of the offense as well as the defendant's personal

6    history and characteristics, I'm persuaded that a custodial

7    sentence of ten years is reasonable and no greater than

8    necessary to hold the defendant accountable, to protect the

9    community, to provide the defendant the opportunity for

10   rehabilitative programs, and to achieve parity with the

11   sentences of similarly situated offenders.

12        As to Count 1 of the indictment, it is adjudged that the

13   defendant is committed to the custody of the Bureau of Prisons

14   for a term of ten years.  I do recommend that the defendant

15   receive substance abuse assessment while incarcerated and any

16   appropriate substance abuse treatment.  I also recommend that he

17   receive mental health treatment and also specifically if the

18   Bureau of Prisons has treatment and counseling that is

19   appropriate for people who have been radicalized into terrorist

20   ideology, I would like Mr. Van Haften to participate in that.

21        I also recommend that the defendant be afforded prerelease

22   placement in a residential re-entry center with work release

23   privileges, and I will impose the life term of supervised

24   release subject to the conditions that I've just outlined.

25        Although the incident offense is not drug related, the

1    defendant does have some self-reported history of drug use.

2    Accordingly, the mandatory drug testing that's set forth in

3    Title 18, United States Code, Section 3583(d) is not waived.

4    The defendant shall submit to one drug test within 15 days of

5    his placement on supervised release and periodic tests

6    thereafter in the discretion of the probation office.

7         Let me just check, is there any statutory requirement that I

8    do any more drug testing than that?

9              THE AGENT:  No, Your Honor.

10             THE COURT:  Okay.  It is adjudged that the defendant is

11   to pay the $100 criminal assessment penalty to the Clerk of

12   Court for the Western District of Wisconsin immediately

13   following sentencing.  I do find that the defendant does not

14   have the means to pay a fine without impairing his ability to

15   support himself upon release from custody and, accordingly, no

16   fine is imposed.

17        Okay.  I think I have covered everything.  Let me also

18   indicate one other factor that I thought was particularly

19   important here is that Mr. Van Haften is convicted of a crime

20   that is a crime of terrorism.  I think the terrorism enhancement

21   applies, but I do find it significant here that there's no

22   direct injury to another person that was traced to his support

23   that he had provided, and it was -- if it were the kind of

24   financial support or anything like that that even would have an

25   indirect impact on any actual violence committed against anyone,

1    I would think that would have been very significant.  As I said,

2    it's not completely a victimless crime.  Mr. Davis, partly

3    through your assistance, now faces a 15-year prison term, so

4    it's not free of any victimhood, but I do think it warrants a

5    very serious crime because I think your intentions to commit

6    violence against the United States were so clearly expressed and

7    you took such significant actions toward the accomplishment of

8    that goal.

9        All right.  So I think I've covered my justifications for my

10   sentence and the term of supervised release, and again to make

11   clear, the reason I am imposing a lifetime term of supervised

12   release is that I think that the conditions that are offered to

13   explain your offense here are really ones that are going to

14   endure probably for the rest of your life.  I hope that you

15   don't respond to them in the way that you have in this case, but

16   I think it warrants a long term of supervised -- supervision for

17   the rest of your life.

18       Okay.  I think I have covered everything except the right to

19   appeal.  Mr. Vaudreuil?

20           MR. VAUDREUIL:  That was all I was going to comment on.

21           THE COURT:  Mr. Bugni.

22           MR. BUGNI:  Two things -- actually three things.  One,

23   could you make a recommendation within 500 miles of the Western

24   District of Wisconsin so he could be -- at least be close to his

25   mom.

1          THE COURT:  For his placement?

2          MR. BUGNI:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. BUGNI:  Two, we'd ask Dr. Spierer's report be

5     attached to the PSR so that the BOP would have it in assessing

6     his risk.

7        And then, three, he was arrested in Turkey on October 24th,

8     but it wasn't until he was arraigned here I believe April 9th,

9     so we would just ask that that time be credited towards his

10    sentence, that six months that he's in custody.

11         THE COURT:  All right.  Mr. Vaudreuil, I'm going to

12    assume that you don't have any objection to the recommendation

13    that he be placed within 500 miles.  It's not really up to me,

14    but I'm willing to make that recommendation.

15         MR. VAUDREUIL:  We have no objection to the Court

16    making that recommendation to BOP.

17         THE COURT:  And the attachment of Dr. Spierer's report

18    is not going to be objectionable to me.

19         MR. VAUDREUIL:  No.

20         THE COURT:  I'll check with the government.  And then

21    what about the credit for time since his arrest?

22         MR. VAUDREUIL:  First of all, that's a question for

23    BOP, and we would object to that, although it's ultimately BOP's

24    decision.  I believe he will get credit from -- he should get

25    credit from his arrest in Chicago in April 2015 but will not get

1    credit for the arrest in Turkey.

2            THE COURT:  Okay.  I think in this case I'm going to

3    leave that to the BOP.  Okay?  And so --

4            MR. BUGNI:  Well, do you desire for him -- in

5    calculating your sentence, were you going back to his arrest in

6    Turkey?  I think that's the dispositive question.

7            THE COURT:  I hadn't actually thought about it.  Okay?

8    I did anticipate that he would get credit for the time that he

9    had served already, but I hadn't specifically contemplated

10   whether it would go from the time he was arrested in Turkey to

11   now.

12           MR. BUGNI:  And I only say that because you made the

13   comment, you know, he has two-and-a-half years of credit, which

14   is correct, or two-and-a-half years you've already served if you

15   go back to the time he's in Turkey.  I mean, he's in chains no

16   matter where he is.  He's detained no matter where he is.  The

17   custody should count no matter if it was, you know, with

18   handcuffs from the United States or handcuffs in Turkey.

19       I'd also note that the criminal complaint in this case

20   issued, I believe, the day after his arrest.  So he should get

21   credit.  It sounded like it was part of your calculus, and I'd

22   just ask that that be put in the minutes, that he would get the

23   time.

24           THE COURT:  All right.

25           MR. VAUDREUIL:  Your Honor --

```
 1              THE COURT:  Mr. Vaudreuil?

 2              MR. VAUDREUIL:  -- first of all, he was not in custody

 3     in Turkey on this charge for one minute.  He was in custody in

 4     Turkey because Turkish immigration authorities took him into

 5     custody given his sex offender status.  He went into custody in

 6     this charge when he got to the United States.  He was brought

 7     back by Turkish officials, Turkish national police, not by

 8     anybody connected to this case.

 9       I have been through this before with an actual drug case

10     where the person spent five years in a Curacao prison before

11     coming back here to be sentenced on the continuation of that

12     drug case, and he did not get credit for the Curacao prison

13     time, but that's a legal matter that is not before the Court.

14     I'm just saying as a factual matter he was not arrested in

15     Turkey for this charge.  He was arrested by Turkish immigration

16     authorities given his status.

17              THE COURT:  Okay.  Look, I did -- in contemplating his

18     sentence, I did consider the time that he was in custody.  I

19     hadn't specifically contemplated the date on which it should

20     begin.  I think it's fair that he was taken into custody for

21     charges that were not these charges, and so I will follow

22     Mr. Vaudreuil's argument -- accept Mr. Vaudreuil's argument that

23     he will get credit for the time that he was in federal custody

24     on these charges.

25              MR. BUGNI:  Sorry, real quick.  He's arrested at a cafe
```

1    setting up to go join ISIS.  Those were the text messages and

2    the communications going on with the Viber app.  You know, it

3    might be that the pretext was we're going to arrest him for

4    being a sex offender -- I don't know Turkish law -- that he's in

5    violation for being a sex offender there, but it's all part of

6    this case.  The FBI is texting with him.  I have no doubt that

7    that is what the stated reason was, that it was a SORNA

8    violation under Turkish law, but if that's part of the

9    Court's -- I guess if that's part of the Court's determination,

10   that's what you're thinking is it goes back to all the time he's

11   in custody, that's where -- I'm not trying to build on the

12   niceties so much as you seem to be in your gut saying I don't

13   want you to get out in five years because -- among many things

14   because you already have two-and-a-half years of credit.  Give

15   the guy two-and-a-half years of credit.

16          THE COURT:  Mr. Vaudreuil, any further response?

17          MR. VAUDREUIL:  He was out of status on his visa, on

18   the U.S. visa, and, yes, he was getting ready to go fight for

19   ISIL, but I would just repeat it's a fact he was taken into

20   custody.  There wasn't any subterfuge.  We do not have the

21   Turkish immigration police working closely with us at all, and

22   they took him into custody on that visa -- on his immigration

23   issues, and then he was brought back to this country and removed

24   from Turkey, so I think as a fact, and BOP will consider that,

25   but as a matter of fact, it was not based on this charge.

1          THE COURT:  I'm satisfied that it is appropriate and

2    fair for my sentence to begin to run at the date that he is in

3    federal custody in the United States on these charges.  When I

4    announced my original sentence of ten years, I hadn't

5    specifically contemplated the moment at which it begins.  Now

6    having heard from both parties, I'm satisfied that it is fair

7    for his sentence to begin when he's in federal custody in the

8    United States.

9          MR. BUGNI:  Thank you, Your Honor.

10          THE COURT:  Okay.  All right.  And I will order that

11    Dr. Spierer's report be included in the PSR, and I will also

12    direct that the Bureau of Prisons should try, if they can,

13    consistent with his needs for Mr. Van Haften's security and the

14    security concerns of the prison and whatever programming needs

15    Mr. Van Haften has, keep him within 500 miles of Janesville so

16    he can maintain his relationship with his mother.

17          Okay, Mr. Van Haften, with that then I'm going to tell you

18    about your right to appeal.  You have the right to appeal your

19    conviction if you think that your plea was somehow unlawful or

20    involuntary, and you have the right to appeal your sentence if

21    you think that it's contrary to law.  If you want to appeal, you

22    must file a notice of appeal within 14 days of entry of judgment

23    or within 14 days of any notice of appeal that might be filed by

24    the government.

25          If you can't afford the filing fee for your appeal, you can

1 apply for leave to appeal in forma pauperis, which means without

2 paying the filing fee, and if you cannot afford an attorney, you

3 may also apply for court-appointed counsel to represent you in

4 the appeal.

5  Okay.  And so also the United States Probation Office is to

6 notify local law enforcement agencies and the state attorney

7 general of the defendant's release to the community.  With that

8 I believe we are finished.  Anything else?

9    MR. VAUDREUIL:  No.  Thanks, Your Honor.

10    MR. BUGNI:  No, Your Honor.

11    THE COURT:  Thank you, all.

12    THE CLERK:  Court is in recess.

13  (Proceedings concluded at 3:15 p.m.)

14        ***

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that the

3    foregoing is a true and accurate record of the proceedings held

4    on the 17th day of February, 2017, before the Honorable James D.

5    Peterson, U.S. District Judge for the Western District of

6    Wisconsin, in my presence and reduced to writing in accordance

7    with my stenographic notes made at said time and place.

8          Dated this 9th day of March, 2017.

9

10

11

12

13

14                              /s/ Jennifer L. Dobbratz

15                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                 Federal Court Reporter
16

17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.